## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

Michael Darling,

                                                  Plaintiff,

            v.                                                    5:25-CV-1779
                                                                    (ECC/MJK)

Kathy Manley,

                                                  Defendant.

---

Michael Darling, Plaintiff *pro se*

Mitchell J. Katz, U.S. Magistrate Judge

To the Honorable Elizabeth C. Coombe, U.S. District Judge

## ORDER & REPORT-RECOMMENDATION

Darling commenced this action on December 19, 2025 by filing a Complaint. ("Compl.,"Dkt. 1). Darling also filed an application for leave to proceed *in forma pauperis* ("*IFP*"). (Dkt. 2). On December 22, 2025, United States District Court Judge Coombe administratively closed the file because Darling's *IFP* application was incomplete. (Dkt. 4). On February 12, 2026, Darling refiled his motion for leave to proceed *IFP*. (Dkt. 5). The Clerk sent the Complaint and *IFP* application to this Court for review.

## I.    BACKGROUND

Darling alleges that Defendant represented him in an appeal.
(Dkt. 1-4). At some point, Darling terminated the representation
because of a dispute about matters that needed to be included in the
appeal. (*Id.*). Darling informed the appellate court that he fired
Defendant "do [sic] to her incompetence, lies and fraud." (*Id.*). Darling
further alleges that Defendant made a fraudulent submission to the
court and that her actions "were unlawful and deliberate knowing full
well she had no authority to proceed with this case." (*Id.*).

Darling alleges federal question jurisdiction based on the Fourth
Amendment, "Art III & 2," and 26 U.S.C. § 7206. (Dkt. 1, ¶ II(A)).
Darling seeks $50,000 in monetary damages. (Dkt. 1, ¶ II(B)(3)).

## II.    *IFP* APPLICATION

Darling declares in his *IFP* applications that he is unable to pay
the filing fee. (Dkt. 5). After reviewing Darling's application, this Court
finds that he is financially eligible for *IFP* status.

## III.    STANDARD OF REVIEW

Courts can *sua sponte* dismiss a case at any time if they determine
that an action is (1) frivolous or malicious; (2) fails to state a claim on
which relief may be granted; or (3) seeks monetary relief against a

defendant who is immune from such relief. *See* 28 U.S.C. § 1915
(e)(2)(B)(i)-(iii).

When determining whether an action is frivolous, courts must
consider whether the complaint lacks an arguable basis in law or fact.
*See Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (cleaned up); *see also*
28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to
prevent abuses of court process as well as to discourage the waste of
judicial resources. *See Neitzke*, 490 U.S. at 327; *see also Harkins v.
Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974).

Courts must show liberality toward *pro se* litigants and use
extreme caution when *sua sponte* dismissing *pro se* complaints. *See
Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d
Cir. 2000). Still, courts have a responsibility to determine that a claim
is not frivolous before permitting a plaintiff to proceed. *See id.*

## IV.  <u>DISCUSSION</u>

### A. The District Court should dismiss the Complaint because Defendant is not a "state actor."

The Court recommends dismissing the Complaint against
Defendant *with prejudice and without leave to amend* because she is
not a "state actor."

To support a claim under 42 U.S.C. § 1983, the defendant must be acting under "color of state law." However, an attorney representing a client in a criminal trial, whether that attorney is a public defender, legal aid attorney, or court-appointed counsel, is not acting under the color of state law. *See Polk County County v. Dodson*, 454 U.S. 312, 325, (1981); *see also Rodriquez v. Weprin*, 116 F.3d 62, 65-66 (2d Cir. 1997) (stating that it is well established that private attorneys—even if the attorney was court appointed—are not state actors for the purposes of Section 1983 claims.). Defendant is therefore not a state actor under Section 1983. And because Defendant is not a state actor, Darling's claims under the Fourth Amendment should be dismissed.

## B. Darling's claim under 26 U.S.C. § 7206 does confer a private cause of action.

Darling's claim under 26 U.S.C. § 7206 should be dismissed even if the District Court finds that Defendant is a "state actor." It is well settled that 26 U.S.C. § 7206, a criminal provision of the Internal Revenue Code, does not confer a private cause of action. *See Feifei Gu v. Zeng,* No. 23-CV-4168, 2023 WL 4138519, at *2 (E.D.N.Y. June 22, 2023) (Plaintiff cannot assert a private cause of action under 26 U.S.C. § 7206); *see also Freedom Calls Found. v. Bukstel*, No. 5-CV-5460, 2006

4

WL 845509, at *28 (E.D.N.Y. Mar. 3, 2006) ("[T]here is no private right of action available to [counterclaimant] under 26 U.S.C. § 7206."). Because 26 U.S.C. § 7206 does not afford Darling a private cause her action, his claim should be dismissed *with prejudice and without leave to amend*.

## V.    **OPPORTUNITY TO AMEND**

Generally, before the court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the court should afford a plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Here, any amendment would be futile because Defendant is not a "state actor" and 26 U.S.C. § 7206 does confer Darling with a private cause of action.

V.    **CONCLUSION**

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED** that Darling's motion to proceed *in forma pauperis*

(Dkt. 5) is **GRANTED**, and it is further

**RECOMMENDED** that the Complaint (Dkt. 1) be **DISMISSED**

**WITH PREJUDICE AND WITHOUT LEAVE TO AMEND** because

Defendant is not a state actor for purposes of 42 U.S.C. § 1983 and any

amendment would be futile, and it is further

**RECOMMENDED** that even if the District Court finds that

Defendant is a state actor, Darling's claim under 26 U.S.C. § 7206

should be **DISMISSED WITH PREJUDICE AND WITHOUT**

**LEAVE TO AMEND** because it does not allow for a private cause of

action, and it is further

**ORDERED** that the Clerk provide Darling with a copy of this

Order and Report-Recommendation, along with copies of the

unpublished decisions cited herein in accordance with the Second

Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per*

*curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[1] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: February 17, 2026.

_____
Hon. Mitchell J. Katz
U.S. Magistrate Judge

---

[1] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2023 WL 4138519
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Feifei GU, Plaintiff,
v.
Hongyi ZENG, also known as Harry Zeng, Defendant.
Feifei Gu, Plaintiff,
v.
Sergio Jimenez, Defendant.

23-CV-4168(EK)(LB), 23-CV-4569(EK)(LB)
|
Signed June 22, 2023

**Attorneys and Law Firms**

Michael Stewart, Pro Se.

Police Officer Scudiero, Pro Se.

Feifei Gu, Brooklyn, NY, Pro Se.

**MEMORANDUM & ORDER**

ERIC KOMITEE, United States District Judge:

**\*1** Plaintiff Feifei Gu filed these *pro se* actions in response
to a landlord-tenant holdover proceeding in Kings County
Housing Court that is slated for trial this month. She names
as defendants the petitioner-landlord and the judge presiding
over that state court matter. On June 20, Plaintiff filed an
emergency order to show cause for a preliminary injunction
and temporary restraining order in each action, seeking,
among other relief, a stay of the impending trial date. The
Court consolidates these actions solely for the purpose of this
Order. Plaintiff's requests to proceed *in forma pauperis* are
granted. For the reasons discussed below, however, Plaintiff's
complaints are dismissed, and her emergency requests for
injunctive relief are thus denied as moot.

## I. Background

In *Gu v. Zeng*, No. 23-CV-4168, Plaintiff Gu asserts violations
of federal law in connection with a holdover proceeding
initiated by Zeng against her in Kings County Housing Court
under Index No. LT-325749-22/KI. *See* Compl. ¶ 5, ECF No.

1. Plaintiff asserts that, in the course of that action, Zeng
violated various federal statutes — primarily in the criminal
code — by making false statements, forging documents, and
committing perjury. *Id.* at ¶¶ 7–17. Plaintiff seeks Zeng's
imprisonment and monetary damages.

In *Gu v. Jimenez*, No. 23-CV-4569, Gu alleges that the
judge presiding over her landlord-tenant action, Judge Sergio
Jimenez, has "distorted the facts," refused her demand for a
jury trial, and improperly denied her motion to dismiss. *See*
Compl. ¶¶ 4–19, ECF No. 1. She again invokes statutes that
criminalize making false statements, forgery, and perjury as
the bases for her claims. *Id.* at ¶¶ 20–22. Plaintiff similarly
seeks monetary damages, and asks that Judge Jimenez be
"disbarred" and imprisoned.

## II. Legal Standard

Under 28 U.S.C. § 1915(e)(2)(B), a district court must dismiss
an *in forma pauperis* action that "(i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted;
or (iii) seeks monetary relief against a defendant who is
immune from such relief." At the pleading stage, "all well-
pleaded, nonconclusory factual allegations" in the complaint
are assumed to be true. *Kiobel v. Royal Dutch Petroleum
Co.*, 621 F.3d 111, 124 (2d Cir. 2010).[1] *Pro se* complaints
are held to less stringent standards than pleadings drafted by
attorneys, and the Court will read a *pro se* complaint liberally
and interpret it as raising the strongest arguments it suggests.
*Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Sealed Plaintiff
v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

[1]  Unless otherwise noted, when quoting judicial
decisions this order accepts all alterations and
omits all citations, footnotes, and internal quotation
marks.

Still, a *pro se* plaintiff is not exempt from "compliance with
relevant rules of procedural and substantive law." *Traguth
v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Furthermore, if the
Court "determines at any time that it lacks subject-matter
jurisdiction, the Court must dismiss the action." Fed. R. Civ.
P. 12(h)(3); *see Henderson ex rel. Henderson v. Shinseki*, 562
U.S. 428, 434 (2011).

## III. Discussion

**Gu v. Zeng, Not Reported in Fed. Supp. (2023)**
Case 5:25-cv-01779-ECC-MJK     Document 7     Filed 02/17/26     Page 9 of 40
2023 WL 4138519

**\*2** In both cases, Plaintiff attempts to invoke this Court's jurisdiction by alleging that the defendant violated various federal criminal statutes. Section 1331 grants a federal court jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see Arbaugh v. Y&H Corp.,* 546 U.S. 500, 513 (2006) ("A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States."). A federal court, however, lacks jurisdiction over a federal claim that "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or is "wholly insubstantial and frivolous." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 89 (1998).

Here, Plaintiff states no valid federal claim. She asserts claims arising under Title 18, Sections 471, 472, 1621, and 1623 — federal statutes that criminalize "forgery" (*i.e.,* counterfeiting) and perjury. "It is a truism, and has been for many decades, that in our federal system crimes are always prosecuted by the Federal Government, not ... by private complaints." *Conn. Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81, 86–87 (2d Cir. 1972); *see Sheehy v. Brown,* 335 F. App'x 102, 104 (2d Cir. 2009) ("[F]ederal criminal statutes do not provide private causes of action."). Plaintiff therefore cannot assert civil claims based on these federal criminal statutes. *See, e.g., Hariprasad v. Master Holdings Inc.,* 788 F. App'x 783, 786 (2d Cir. 2019) (finding "no basis for implying a private right of action" under Section 472 and affirming dismissal for lack of subject-matter jurisdiction); *Ojeda v. Mendez,* No. 20-CV-3910, 2021 WL 66265, at \*3 (E.D.N.Y. Jan. 7, 2021) (dismissing claims brought under Section 471, among other statutes); *Faraldo v. Kessler,* No. 8-CV-261, 2008 WL 216608, at \*6 (E.D.N.Y. Jan. 23, 2008) (collecting cases and dismissing claims brought under Sections 1621 and 1623). For the same reason, Plaintiff cannot assert a private cause of action under 26 U.S.C. § 7206, a criminal provision of the Internal Revenue Code. *See Freedom Calls Found. v. Bukstel,* No. 5-CV-5460, 2006 WL 845509, at \*28 (E.D.N.Y. Mar. 3, 2006) ("[T]here is no private right of action available to [counterclaimant] under 26 U.S.C. § 7206."). [2]

[2]    Plaintiffs also has not demonstrated subject-matter jurisdiction based on a diversity of citizenship. Under Section 1332, federal courts may exercise jurisdiction over state law claims where the parties are citizens of different states and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." *See* 28 U.S.C. § 1332(a). Here, Plaintiff indicates that she is a

citizen of New York, and it appears that each defendant is as well.

Ultimately, Plaintiff alleges claims arising from the tenant holdover proceeding in state court and the actions taken by the defendants in connection with that proceeding. Based on the allegations in the complaints, the Court lacks federal jurisdiction over such landlord-tenant and related matters. *See, e.g., Johnson v. Ikezi,* No. 20-CV-2792, 2021 WL 1091910, at \*2 (E.D.N.Y. Mar. 22, 2021) ("[T]o the extent Plaintiffs seek the Court's intervention in a landlord-tenant proceeding, there is ... no basis for federal jurisdiction."); *Southerland v. N.Y.C. Hous. Auth.,* No. 10-CV-5243, 2011 WL 73387, at \*2 (E.D.N.Y. Jan. 7, 2011) (dismissing claims for wrongful eviction for lack of subject-matter jurisdiction). [3]

[3]    Additionally, Plaintiff's request for emergency injunctive relief — to stay the ongoing holdover proceeding in Kings County Housing Court — is barred by the Anti-Injunction Act. Under that statute, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Courts in this Circuit have regularly applied the Anti-Injunction Act in denying requests to enjoin state-court eviction proceedings. *See, e.g., Watkins v. Ceasar,* 88 F. App'x 458, 459 (2d Cir. 2004); *Sierra v. City of New York,* 528 F. Supp. 2d 465, 467–69 (S.D.N.Y. 2008); *Allen v. N.Y.C. Hous. Auth.,* No. 10-CV-168, 2010 WL 1644956, at \*3 (S.D.N.Y. Apr. 20, 2010) (collecting cases).

**\*3** Moreover, even if Plaintiff could assert private causes of action here, her claims against Judge Jimenez would be barred by absolute immunity. Judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities, save for a few exceptions not applicable here. *See Mireles v. Waco,* 502 U.S. 9, 11 (1991) (suits for money damages); 42 U.S.C. § 1983 (suits for injunctive relief). "[A]cts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt,* 579 F.3d 204, 210 (2d Cir. 2009). Here, the claims against Judge Jimenez arise from decisions made during the state court holdover proceeding and thus plainly fall within the scope of his judicial capacity. As a result, such claims are barred by judicial immunity. *See, e.g., Herbert v. Devito,* No. 18-

**Gu v. Zeng, Not Reported in Fed. Supp. (2023)**

Case 5:25-cv-01779-ECC-MJK     Document 7     Filed 02/17/26     Page 10 of 40

2023 WL 4138519

CV-5287, 2018 WL 4845737, at *3 (E.D.N.Y. Oct. 4, 2018); *Southerland*, 2011 WL 73387, at *2.

### IV. Conclusion

For the foregoing reasons, Plaintiff's requests to proceed *in forma pauperis* are granted. Her complaints are dismissed without prejudice. *See* Fed. R. Civ. P. 12(h)(3). The emergency requests for a preliminary injunction and temporary restraining order are denied as moot. The Clerk of Court is directed to enter judgment, close these cases, and mail a copy of this Memorandum and Order to Plaintiff.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. Coppedge v. United States, 269 U.S. 438, 444–45 (1962).

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2023 WL 4138519

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (2)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 23-1038**<br>Gu v. Jimenez | — | C.A.2 | July 17, 2023 | Docket |
| **2.  Docket 1:23-CV-04168**<br>Stewart et al v. Caligeuri # 1902 | — | E.D.N.Y. | June 06, 2023 | Docket |

**History (3)**

**Direct History (3)**

1.  Gu v. Zeng 🔖
    2023 WL 4138519 , E.D.N.Y. , June 22, 2023

*Appeal Dismissed by*

2.  Gu v. Jimenez
    2023 WL 9231563 , 2nd Cir.(N.Y.) , Nov. 22, 2023

*Certiorari Denied by*

3.  Gu v. Jimenez
    144 S.Ct. 1396 , U.S. , Apr. 22, 2024

KeyCite Yellow Flag
Distinguished by    Sasqua Group, Inc. v. Courtney,    E.D.N.Y.,    August 2, 2010

KeyCite Overruling Risk
Overruling Risk    Erchonia Corp. v. Bissoon,    2nd Cir.(N.Y.),    February 22, 2011

2006 WL 845509
Only the Westlaw citation is currently available.
ON LINE Publication ONLY
United States District Court,
E.D. New York.

FREEDOM CALLS FOUNDATION,
a New York corporation, Plaintiff,
v.
Edward BUKSTEL, Defendant.
Edward Bukstel, Counterplaintiff/Third–Party Plaintiff,
v.
Freedom Calls Foundation, a New
York corporation, Counterdefendant,
and
John B. Harlow II, Kate Green, Warren Sherman,
Daniel Kurtz and J.J. Leitner, Third–Party Defendants.

No. 05CV5460(SJ)(VVP).
|
March 3, 2006.

**Attorneys and Law Firms**

Holland & Knight LLP, New York, NY, By: Christelette Angelika Hoey, Tamara F. Carmichael, for Plaintiff.

Edward Bukstel, Blue Bell, PA, Defendant pro se.

*MEMORANDUM & ORDER*

JOHNSON, Senior District Judge:

**\*1** Presently before the Court is Plaintiff–Counterdefendant Freedom Calls' ("Plaintiff") motion for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, to restrain Defendant–Counterplaintiff–Third–Party Plaintiff Edward Bukstel ("Defendant"),[1] a former officer, employee and director of Plaintiff, from engaging in ongoing acts of unfair competition and cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1051 et seq., as well as related and independent violations of New York state statutory and common law. Plaintiff also moves this Court for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.

[1]    Defendant was also the named plaintiff in *Bukstel v. Harlow et al.,* Docket No. 05 CV 5996, which was pending in the United States District Court for the Eastern District of Pennsylvania ("Pennsylvania Federal Court"). In that case, Defendant alleged that Plaintiff and its current directors are liable for retaliatory termination, fraud, embezzlement, negligence, breach of contract, defamation, and breach of fiduciary responsibilities. *See* Complaint, *Bukstel v. Harlow et al.,* Docket No. 05 CV 5996 (E.D.Pa. Nov. 15, 2005). On February 2, 2006, the Pennsylvania Federal Court entered an order of dismissal for the *Bukstel v. Harlow et al.* action, upon Defendant's request.

Also before this Court is Defendant's motion for a temporary restraining order ("TRO"), preliminary injunction, and appointment of a receiver. Defendant seeks to enjoin and restrain Plaintiff's directors from (1) using the business e-mail account assigned to Defendant while he was affiliated with Plaintiff to distribute misleading and fraudulent tax documentation to Plaintiff's donors and patrons and (2) falsifying tax returns, perpetuating fraud, and misappropriating assets from Plaintiff.

*BACKGROUND*

Plaintiff, a New York not-for-profit corporation,[2] was formed in 2003 to carry out the charitable mission of building a communications network which enables men and women on active duty in the United States Armed Forces to communicate free of charge from their base camps with their families at home. (Am.Compl.¶¶ 1, 5.) Plaintiff was founded by Defendant and Plaintiff's current Executive Director, John Harlow ("Harlow"). (Am.Compl.¶ 9.) Both Defendant and Harlow served on Plaintiff's initial board of directors. (Harlow Decl. ¶ 4.)

[2]    Plaintiff has also been recognized by the Internal Revenue Service as a tax-exempt organization,

as described in Section 501(c)(3) of the Internal Revenue Code. (Am.Compl.¶ 1.)

From September 2003 until the present, Plaintiff used the marks FREEDOM CALLS and FREEDOM CALLS FOUNDATION (collectively, the "Marks") when communicating with the public about its charitable services. (Am.Compl.¶ 6, 7.) Plaintiff has received national and international publicity for the work it does and has also received recognition from the United States Department of Defense, United States Army, and the United States Defense Security Service. (Harlow Decl.³ ¶ 10, Ex. F, G.) As a result of this continuous usage, Plaintiff alleges that it has all common law rights in and to the Marks. (Am.Compl.¶ 7.)

³      All citations to "Harlow Decl." refer to Harlow's Declaration in support of Plaintiff's Motion for a Preliminary Injunction and for Leave to File an Amended Complaint, unless otherwise noted.

In addition to using the Marks, Plaintiff also secured the "freedomcalls.org" domain (the "Plaintiff Domain") and subsequently built Plaintiff's website using the uniform resource locator (the "URL") *www.freedomcalls.org.* (Am.Compl. ¶ 11.) On or about October 28, 2005, Plaintiff submitted applications to the United States Patent and Trademark Office ("USPTO") to register the Marks as trademarks. (Am.Compl.¶ 6.)

Since its formation, Plaintiff has maintained a list of corporations, state agencies, schools, colleges, telemedicine agencies, and other entities with videoconferencing capabilities that have provided conferencing venues for military families, as well as a list of family-readiness group personnel that is responsible for executing the scheduled events and conferences (collectively, the "Supporters"). (Harlow Decl. ¶ 11; Hr'g Tr.⁴ 16:6–11.) Contact information for the Supporters is maintained in a database called Operation Hometown Link. (Hr'g Tr. 15:1–12.) Additionally, Plaintiff maintains contact information for those who have used or expressed a desire to use Plaintiff's services to communicate with deployed friends and families (the "Clients"). (Harlow Decl. ¶ 11.) Contact information for the Clients is kept on various spreadsheets, which are updated with family-contact and military-contact information each time an event is held. (Hr'g Tr. 16:14–19.) Plaintiff refers to the lists containing contact information for both Supporters and Clients as the "Supporter & Client List." (Harlow Decl. ¶ 12.) Plaintiff alleges that the Supporter & Client List is a trade secret and that the names and the contact information

contained therein are not disclosed on the Internet or in any public documents. (*Id.*)

⁴      All citations to "Hr'g Tr." refer to the evidentiary hearing held before this Court on January 12, 2006 for Plaintiff's Motion for Preliminary Injunction and for Leave to File an Amended Complaint and Defendant's Motion for a Temporary Restraining Order, Preliminary Injunction and Appointment of a Receiver, unless otherwise provided.

**\*2**  While employed with Plaintiff, Defendant's assigned email address was *ebukstel@freedomcalls.org.* (Am.Compl.¶ 17.) On August 11, 2005, while still employed with Plaintiff, Bukstel registered the domain name "freedomcalls.us" (the "Bukstel Domain") with Go Daddy Software, Inc. (Harlow Decl., Ex. H.) Soon thereafter, Defendant used the Bukstel Domain to create a website (the "Bukstel Website") using the URL *www.freedomcalls.us* (the "Bukstel URL"). (Am.Compl.¶ 15.) Defendant also used the Bukstel Domain to establish a new e-mail address, *ebukstel@freedomcalls.us* (the "Bukstel E-mail"). (Am.Compl.¶ 16.)⁵

⁵      Defendant's pleadings also reveal that he established and uses a Yahoo! Instant Message account with the name "freedomcallsbukstel ." (Def.'s Mot. TRO Prelim. Injunc. at 5.) Although there is no evidence of the frequency with which Defendant uses this instant message account, the evidence before the Court confirms that the it was used on December 17, 2005 to correspond with an individual that appears to be a Supporter or Client regarding whether satellite service connecting the United States to Iraq would lapse. (*Id.*)

The Bukstel Website's front page included a banner at the top that read "Freedom Calls Volunteers." (Hr'g, Pl.'s Ex. 9. at 1.)⁶ Below the banner, there were links entitled "Home Page," "About Us," "Contact Us," "Volunteers," and "Contribute." (Hr'g, Pl.'s Ex. 9. at 1.) A short description of the services offered by Plaintiff appeared below the aforementioned links. (*Id.*) Thereafter, the Bukstel Website provided several pictures of Supporters and Clients at various events sponsored by Plaintiff. (*Id.* at 1–4.)

⁶      On or about January 17, 2006, the content of the Bukstel Website was altered significantly. Based on this Court's review of the Bukstel

Website, all hyperlinks, pictures, text, and logos relating to, or suggesting affiliation with, Plaintiff have been removed. On that date, only a white background, a red line, and a ribbon colored with the United States Flag, reminiscent of the "Support Our Troops" ribbons, Go Daddy Software, Inc. logos, a 2006 copyright, and a non-working "Home Page" hyperlink were visible on the face of the website. To be sure, the fact that Defendant, at least in part, has removed potentially infringing content from Bukstel Website does not render an award of preliminary relief moot because he has not provided the Court or Plaintiff with a consent injunction or other enforceable assurance that the alleged infringement will not be repeated. *See Columbia Pictures Indus. v. Miramax Films Corp.,* 11 F.Supp.2d 1179, 1183 (stating that where defendants' posters and film trailers allegedly infringed plaintiffs' copyrights, "the withdrawal of the complained of advertising does not render this action moot" on motion for preliminary injunction); *Upjohn Co. v. Am. Home Prods. Corp.,* 598 F.Supp. 550, 554–55 (S.D.N.Y.1984) ("Before a suit for injunctive relief can be dismissed as moot, the offending conduct must have ceased and the court must find that there is no reasonable expectation that it will resume.") (citations omitted). Defendant has not even provided Plaintiff with reasonable assurance that the infringing website will not recur. *Cf. American Express Travel Related Servs. Co., Inc. v. Mastercard Int'l Inc.,* 776 F.Supp. 787, 790 (S.D.N.Y.1991) (finding injunction moot once defendant ceased showing infringed television commercial and had already filmed a noninfringing replacement); *Greilsheimer v. Ferber Chan & Essner,* No. 98 CV 2553, 1998 U.S. Dist. LEXIS 13445, *1, *2–*3 (S.D.N.Y. Aug. 27, 1998) (injunction against trademark infringement not necessary where defendants had not only agreed to stop using plaintiff's name on firm's sign and stationery, but had already ordered new, noninfringing sign and stationery).

When a user clicks on the "About Us" link, a more detailed program description of Plaintiff appeared, along with additional pictures of Supporters and Clients at Plaintiff-sponsored events. (*Id.* at 5–7.) The program description included on the Bukstel Website was substantially the same as that which appears on Plaintiff's official website. (*Id.* at

5; *see* Pl.'s Hr'g Ex. 6, 2–3.) The "Contact Us" link takes website users to language that instructed "Freedom Calls Volunteers" to "schedule a video connection or volunteer locations for connecting troops and families" by providing contact information. (*Id.* at 8.) The Bukstel Website also provided *info @freedomcalls.us* as a point of contact. (*Id.*)

Harlow learned about the Bukstel Website from an individual who contacted him sometime after August 2005. (Hr'g Tr. 37:22–23.) Under the impression that the Bukstel Website belonged to Plaintiff, the individual commented to Harlow about the change in the quality of the website's look and feel. (*Id.* at 37:24–25; 38:1–2.) After receiving information about the existence of the Bukstel Website, Harlow conducted a "WHOIS" search in order to determine the identity of the Bukstel Website registrant. (Hr'g Tr. at 38:2–4.) Harlow's search revealed that Defendant registered the Bukstel Domain on August 11, 2005. (*Id.* at 38:5–7.) Soon thereafter, Harlow contacted Defendant via phone and via e-mail to request that Defendant disable the Bukstel Website. (*Id.* at 39:25, 40:1.) These requests were apparently refused or ignored by Defendant.

By and through its counsel, Plaintiff issued "cease and desist" letters to Defendant, on August 29, 2005 and again on October 31, 2005, requesting that Defendant disable the Bukstel Website. (Harlow Supp. Decl. [7] ¶ 2–3; Am. Compl. ¶ 30.) Although the content of the Bukstel Website has changed since these demand letters were issued, Defendant has not fully complied with these demand letters, as the Bukstel URL is still functional. (*See* Am. Compl. ¶ 30.)

[7]     All citations to "Harlow Supp. Decl." refer to Harlow's Supplemental Declaration in Reply to Defendant's Opposition to, and in further support of, Plaintiff's Motion for a Preliminary Injunction and for Leave to File an Amended Complaint, unless otherwise noted.

**\*3** On or about November 8, 2005, Plaintiff terminated Defendant, apparently because of the acrimony between Defendant and members of Plaintiff's board of directors. (Am. Compl. ¶ 14; Def.'s Resp. Mem. Def.'s PI Mot. [8] at 4.) In the days immediately following Defendant's termination, Plaintiff, via Harlow, monitored Defendant's "freedomcalls.org" account in order to field inquiries from Supporters and Clients that attempted to contact Defendant with inquiries related to Plaintiff. (Harlow Opp'n Decl. [9] ¶ 8.) As a general practice, Harlow responded

to Defendant's e-mails by sending reply messages from Harlow's e-mail account, rather than from Defendant's *ebukstel @freedomcalls.org* account, and explaining that Defendant was no longer affiliated with Plaintiff. (*Id.* at ¶ 9.) However, in the first or second day following Defendant's termination, Harlow responded to e-mails directly from Defendant's "freedomcalls.org" account. (Hr'g Tr. 49:13–16.) On November 11, 2005, Harlow responded to an e-mail from a donor (and a friend of Defendant) that requested a copy of Plaintiff's annual tax return. Without explaining that Defendant was no longer associated with Plaintiff, Harlow provided the donor with the requested tax documentation. (*Id.* at ¶ 10.) Since that time, Harlow avers that he has not used the *ebukstel@freedomcalls.org* e-mail address to respond to e-mails sent to that account. (Hr'g Tr. 50:20–22.)

8    All citations to "Def.'s Resp. Mem. Def.'s PI Mot." refer to Defendant's Response Memorandum of Law for Plaintiff's Response in Opposition to Defendant's Motion for TRO, Preliminary Injunction, and Appointment of a Receiver, unless otherwise noted.

9    All citations to "Harlow Opp'n Decl." refer to Harlow's Declaration in Opposition to Defendant's Motion for a Temporary Restraining Order, Preliminary Injunction, and Appointment of a Receiver, unless otherwise noted.

After his termination, Defendant used the Bukstel Email to contact Supporters and Clients. On November 23, 2005, and again on December 6, 2005, Defendant sent e-mails from the Bukstel E-mail to Supporters and Clients stating that Plaintiff had canceled or threatened to cancel various video teleconferences. (Am.Compl.¶ 20.) These e-mails also contained statements that Harlow mistreated troops and their families and embezzled money from Plaintiff's bank accounts. (Am.Compl.¶ 21.) On January 13, 2006 message, Defendant used the Bukstel E-mail to send a message that accused Harlow of providing perjurious testimony at the January 12 evidentiary hearing. (Pl.'s 1/18/2006 Ltr., Ex. A.) Plaintiff asserts that these statements are false and that Defendant has made "numerous" other false statements on the Bukstel Website and during the process of contacting and/or soliciting Supporters and Clients. (Am.Compl.¶ 22.)

Plaintiff filed the complaint in the instant action on November 18, 2005, alleging 13 causes of action. [10] Defendant answered this complaint and also alleged several counterclaims against Plaintiff and third-party claims against various board

members and attorneys for Plaintiffs. [11] On December 8, 2005, Plaintiff moved this Court for a preliminary injunction, and Defendant cross-moved for similar relief. Defendant also moved for appointment of a temporary receiver and a motion to disqualify Holland & Knight LLP as Plaintiff's counsel. On January 11, 2006, the Court held an evidentiary hearing on these motions.

10    Plaintiff's 13 causes of action, as provided in the Amended Complaint, are violation of the Anti–Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (Count I), federal unfair competition, 15 U.S.C. § 1125(a) (Count II), common law unfair competition (Count III), violations of New York Unfair Competition Law, N.Y. Gen. Bus. § 360–1 (Count IV), unjust enrichment (Count V), common law trademark infringement (Count VI), breach of fiduciary duty (Count VII), trade secret misappropriation (Count VIII), tortious interference with business relations (Count IX), defamation (Count X), trade libel (Count XI), fraud (Count XII), and prima facie business tort (Count XIII).

11    Defendant's counterclaims and third-party claims, as provided in Defendant's Answer, Affirmative Defenses, and Counterclaims, include retaliatory termination, fraud; embezzlement, negligence, breach of contract, defamation, and breach of fiduciary responsibility.

## JURISDICTION

**\*4** This Court has jurisdiction over Plaintiff's Lanham Act unfair competition and cyber-squatting claims, pursuant to 15 U.S.C. § 1121(a) ( "The district ... courts of the United States shall have original jurisdiction ... of all actions arising under [the Lanham] Act[.]") The Court has jurisdiction over Plaintiff's and Defendant's state law claims, pursuant to 28 U.S.C. § 1367 ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction[.]"). Under New York's choice of law rules, New York law properly applies to this case because the relevant transactions appear to have occurred in New York. *See Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) (noting that a federal court adjudicating a supplemental state law claim applies the choice of law rules of the forum state); *Lazard Freres & Co. v.*

*Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.1997) (stating that New York applies the law of the state having the most significant contacts to the underlying transaction).

*DISCUSSION*

I. *PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION*

A. Standard for Preliminary Injunction

A party seeking a preliminary injunction must show (1) immediate irreparable injury and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly towards the movant. *See Fed. Express Corp. v. Fed. Expresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000).* Irreparable injury under the Lanham Act is presumed if a plaintiff is able to show likelihood of confusion, but must be proved independently absent a showing of likely confusion. *See id.* at 174. The movant must show that injury is "neither remote or speculative, but actual and imminent." *Rodriguez by Rodriguez v. DeBuono,* 175 F.3d 227, 233–34 (2d Cir.1999). Because monetary loss may be estimated and compensated, such harm is not considered irreparable harm, *Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999), unless the movant can show the monetary loss cannot be compensated, for example, because it will probably result in bankruptcy, *Borey v. Nat. Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991).

B. Application of the Preliminary Injunction Standard

1. *Likelihood of Success on the Merits*

As previously noted, Plaintiff brings thirteen causes of action against Defendant, six of which serve as the basis for Plaintiff's preliminary injunction request. Each of these six claims will be examined in turn to determine Plaintiff's likelihood of success on the merits.

a. *Unfair Competition in Violation of the Lanham Act (Count Two)*

Plaintiff alleges that Defendant's use of the Marks in the Bukstel Domain, Website, URL, and E-mail constitute unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), because it falsely designates Defendant's unauthorized products and/or services as originating, being

sponsored by, or having a connection with Plaintiff. (Am.Compl.¶ 40.) Defendant contends that his use of the Marks does not violate the Lanham Act because the Bukstel Domain, URL, Website, and Email were created in good faith and are not "in commerce" as contemplated by the Lanham Act. (Def.'s Opp'n Mot. [12] at 2.) Moreover, Defendant states that Plaintiff waived its right to challenge use of the Marks by bringing an action against him four months after discovering existence of the Bukstel Website. (Def.'s Opp'n Mot. at 1.) Defendant further argues that Plaintiff has "unclean hands" with respect to the Lanham Act unfair competition claim because Plaintiff has also engaged in various acts of trademark and copyright infringement. (Def.'s Opp'n Mot. at 2.)

[12]   All citations to "Def.'s Opp'n Mot." refer to Defendant's Memorandum of Law Opposing Plaintiff's Order to Show Cause, unless otherwise noted.

**\*5** Section 43(a) of the Lanham Act creates a federal private cause of action for injunctive relief and damages against a person who *"uses in commerce* any word, term, name, symbol, or device" or "any false designation of origin" that is "likely to cause confusion" as to the origin of a product. 15 U.S.C. § 1125(a) (emphasis added). Section 43(a) protects registered marks, but also protects certain unregistered trademarks from infringement and even offers a degree of protection from unfair competition for "unregistrable marks," such as generic words that have acquired significant secondary meaning. *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997).

Before turning to the substantive Lanham Act analysis, the Court will first address Defendant's contention that the Lanham Act is not applicable here because the Bukstel Website does not participate "in commerce." (Def.'s Opp'n Mot. at 2.) Presumably, Defendant's argument is based on the fact that neither goods nor services are actively sold or advertised on the Bukstel Website. The Court finds this argument to be without merit. The "use in commerce" requirement is a jurisdictional predicate of the Lanham Act and, therefore, is broad and has sweeping reach. *Planned Parenthood Fed'n. of Am., Inc. v. Bucci,* No. 97 CV 0629, 1997 WL 133313, *1, *3 (S.D.N.Y. Mar. 24, 1997).* In this case, Defendant's actions have potentially affected Plaintiff's ability to offer and to provide its telecommunications services, which were undoubtedly "in commerce." *See Planned Parenthood Fed'n of Am., Inc.,*

1997 WL 133313, at *3. Thus, even if Defendant's activities (including the operation of the Bukstel Website) were not in interstate commerce for Lanham Act purposes, the potential effect of those activities on *Plaintiff's* commercial activities place Defendant within the reach of the Lanham Act. *See id.* Moreover, the presence of the Bukstel Website on the Internet, where it is capable of being accessed by national and international users, is sufficient to bring Defendant's use of the Marks within the reach of the Lanham Act. *See id.*

(1) Validity of the Marks at Issue

The Court now turns to the issue of whether FREEDOM CALLS AND FREEDOM CALLS FOUNDATION, although unregistered marks, are protected by the legal ambit of the Lanham Act. In the United States Court of Appeals for the Second Circuit (the "Second Circuit"), it is established that an unregistered mark is entitled to Lanham Act protection if it would qualify for registration. *See Thompson Med. Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 215–16 (2d Cir.1985). To qualify for protection, and thus registration, a mark must either be (1) "inherently distinctive" or (2) distinctive by virtue of acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Thus, Plaintiff will prevail on the merits of its unregistered trademark infringement claim if it can show that "it has a valid trademark entitled to protection and that the defendant's use of it is likely to cause confusion." *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995).

**\*6** Marks are classified, in ascending order of strength, as "(1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." *Star Indus. v. Bacardi & Co.,* 412 F.3d 373, 384–385 (2d Cir.2005). Generic marks are those consisting of words identifying the relevant category of goods or services. *Id.* at 385. They are not at all distinctive and thus are not protectable under any circumstances. *Id.* Descriptive marks are those consisting of words identifying qualities of the product or services. *Id.* They are not inherently distinctive, but are protectable provided they have acquired secondary meaning, which is sometimes referred to as "acquired distinctiveness." *Id.* Suggestive marks and arbitrary or fanciful marks are each inherently distinctive. *Id.* Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product through the use of imagination, thought and perception. *Id* . Finally, arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion. *Id.*

While Plaintiff states that the Marks are suggestive or fanciful mark in the context of its "likelihood of confusion analysis," discussed *infra,* Plaintiff also engages in a discussion of the Marks' acquired secondary meaning, which is only relevant when a mark is found to be descriptive. *See* Pl.'s Mem. Law. Supp. Mot. Prelim. Injunc. at 10. The Court finds that the Marks are, most likely, suggestive. Both FREEDOM CALLS and FREEDOM CALLS FOUNDATION suggest, through the use of imagination and thought, the qualities of the products and services offered by Plaintiff. Specifically, the word "Calls" in the Marks suggests the ability of Plaintiff's clients to communicate telephonically with one another. Also, the word "Freedom" evokes the idea that the "Calls" are in some way in support of or related to patriotism, the United States Armed forces, or other government-related ideas, entities, or persons.

At a minimum, the Court finds that the Marks are descriptive. Therefore, if the Marks have secondary meaning, then they are protectable under the Lanham Act. Under Second Circuit precedent, the following factors are relevant in determining secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. *Centaur Commc'n v. A/S/M Commc'n,* 830 F.2d 1217, 1222 (2d Cir.1987).

With respect to the first factor, advertising expenditures, Plaintiff avers that it has expended over $100,000 in order to promote its services. (Harlow Decl. ¶ 8.) Although this amount is relatively modest, it is apparent that Plaintiff has achieved at least a modicum of advertising success, which the Court finds compelling. *See Centaur Commc'n,* 830 F.2d at 1222 (citing *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir.1987) (noting that the test of secondary meaning is not the size of the expenditures used to create [a mark] but its effectiveness)). Plaintiff has used its advertising expenditures to sponsor events, attend events, promote its services, produce posters and other signage, and maintain its website. (Hr'g Tr. 89:7–9, 18–21 .) Additionally, Plaintiff's advertising reach extends beyond the reach of its own financial outlays, as the organization receives donations of advertising and marketing resources. (Hr'g Tr. 89:11–18 .) Moreover, Plaintiff has consistently directed its marketing efforts toward the target customer group, that is, families of deployed military personnel and branches of the United States Military. *See Centaur Commc'n,* 830 F.2d at 1222 (finding modest advertising expenditures weighed in favor

of secondary meaning because plaintiff invested efforts in publicizing its connection to the mark by, *inter alia,* sending brochures to the relevant consumer group (top American advertising agencies) and by sending its senior director from Europe to the United States to meet with advertising agencies). Plaintiff currently serves approximately 25% of the Marines deployed to Iraq and serves anywhere from 1200 to 2000 soldiers daily in its technology facilities. (Hr'g Tr. 18:1–4.) Therefore, the Court finds that Plaintiff's advertising expenditures likely weigh in favor of the Marks' secondary meaning.

**\*7** The second factor, the availability of consumer studies linking the mark to a source, has no bearing on the present controversy since neither party submitted evidence with respect to consumer studies linking the Mark to the source.

Turning to the third factor in the secondary meaning inquiry, unsolicited media coverage, Plaintiff has adduced evidence of the fact that it has been profiled in various national and international media outlets and has been recognized by various governmental agencies. (Harlow Decl., Ex. F and G.) For example, the "Press" page on Plaintiff's website at *www.freedomcalls.org* lists more than 100 instances, with some as recent as February 20, 2006, where Plaintiff has received press coverage as a result of its video- or tele-conferences. Therefore, the Court finds that this factor likely weighs in favor of the Marks' secondary meaning.

The fourth factor in the secondary meaning inquiry is Plaintiff's sales success as a result of its use of the Marks. Although no exact number of users is available, it is clear based on the amount of unsolicited media coverage received to date that Plaintiff's services have been well-received by the target audience, that is, military personnel and their families. However, given that more specific information relating to this factor is unavailable, the Court makes no finding as to Plaintiff's sales success as a result of its use of the Marks.

The Court now considers what is, in this case, a significant factor in the secondary meaning analysis—Defendant's attempts to plagiarize the Marks. As evidence of Defendant's attempts to plagiarize the Marks, Plaintiff cites Defendant's use of the Bukstel Domain and E-mail. Defendant counters this allegation by stating that the Bukstel Domain was created to assuage clients and military personnel that were complaining about the outdated material contained on Plaintiff's official website. (D's Opp'n Mot. at 2.) In *Centaur Communications,* the court compared

Centaur's MARKETING WEEK to A/S/M's mark and found striking similarities, leading the court to conclude that the mark had been copied in an effort to take advantage of Centaur's consumer recognition and goodwill. 830 F.2d at 1224. Similarly, the differences between the Bukstel Domain (freedomcalls.us) and the Plaintiff Domain (freedomcalls.org) is merely the URL extension. Further, the Bukstel E-mail (*ebukstel @freedomcalls.us* ) is strikingly similar to the email Defendant used while affiliated with Plaintiff (ebukstel@freedomcalls.org). Notwithstanding Defendant's allegations of his benign motive, the Court finds that Defendant likely plagiarized, with knowledge, Plaintiff's Marks.

Finally, the Court considers the length and exclusivity of Plaintiff's use of the Marks. Plaintiff avers that it has used the Marks since its inception in September 2003, and that such use has been exclusive. (Pl.'s Mem. Law. Supp. Mot. Prelim. Injunc. at 6.) There is no evidence of a break in service that would suggest that this exclusive use has been disrupted. Furthermore, there is compelling evidence that Plaintiff fervently protected itself against potentially infringing uses of the Marks, contrary to Defendant's assertion. Specifically, Plaintiff, via Harlow, requested that Defendant stop using the Busktel Website soon after learning of its existence. Plaintiff, through counsel, also sent two cease and desist letters to Defendant, requesting that he discontinue use of the Bukstel Website. In contrast, Defendant does not present any credible evidence that Plaintiff's use of the Marks is not exclusive. Therefore, the Court finds that Plaintiff's use of the Marks is most likely exclusive.

**\*8** Based on the foregoing, the Court finds that the Marks have likely acquired secondary meaning and therefore are likely to be entitled to the protections afforded by the Lanham Act.

(2) Likelihood of Confusion

Having determined that FREEDOM CALLS and FREEDOM CALLS FOUNDATION will likely be deemed valid marks and thus entitled to legal protection, the Court must now consider whether there is a likelihood of confusion in the instant case. In order to be confused, Plaintiff must show that the public believed that it "sponsored or otherwise approved" the use of the Marks in the Bukstel Domain, URL, Website, and E-mail. *Pfizer Inc. v. Astra Pharm. Prods.,* 858 F.Supp. 1305, 1323 (S.D.N.Y.1994).

In determining likelihood of confusion, this Court will utilize the nonexclusive list of factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), commonly referred to as the *Polaroid* factors: (1) strength of plaintiff's mark; (2) degree of similarity between plaintiff's and defendant's marks; (3) competitive proximity of the goods or services under the marks; (4) likelihood that plaintiff will "bridge the gap" and offer products or services such as defendant's products or services; (5) actual confusion between the products or services; (6) good faith on the defendant's part; (7) quality of defendant's product; and (8) sophistication of buyers of plaintiff's and defendant's goods or services. The foregoing list of factors does not exhaust the possibilities—the court may still have to take other variables into account. *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993). Moreover, "no single *Polaroid* factor is determinative." *Id.* Rather, "the proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *Id.*

Furthermore, if the evidence shows that the defendant intentionally copied the plaintiff's mark, likelihood of confusion will be presumed as a matter of law. *New York State Soc. of Certified Pub. Accountants v. Eric Louis Assocs.,* 79 F.Supp.2d 331, 340 (S.D.N.Y.1999) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir.1987)).

Plaintiff alleges that three aspects of Defendant's conduct cause a likelihood of confusion: (1) Defendant's use of each of the Marks, particularly on the Bukstel Website; (2) registration and use of the Bukstel Domain; and (3) creation and use of the Bukstel E-mail. The Court finds that each of Defendant's allegedly unlawful acts provides compelling evidence of intentional plagiarism; therefore, a presumption of confusion exists. As has been made clear through pleadings and hearing testimony, Defendant was one of Plaintiff's co-founders, served as a member of the board of directors, and as an officer and employee of the organization. Therefore, it is highly unlikely that Defendant was unaware that Plaintiff used the Marks to identify itself. *See New York State Soc. of Certified Pub. Accountants.,* 79 F.Supp.2d at 340 (S.D.N.Y.1999). Defendant operated with full knowledge of the current use of the Marks when he placed the FREEDOM CALLS FOUNDATION logo on the Bukstel Website and included the FREEDOM CALLS mark in the Bukstel Domain, URL, and E-mail. Therefore, it is likely that Defendant developed the Bukstel Domain, URL, Email, and Website with a clear intent to copy the Plaintiff's Marks.

Defendant has not provided sufficient evidence to rebut this presumption and, as a result, the presumption remains intact.

**\*9** This presumption of confusion is further confirmed by this Court's application of the *Polaroid* factors to the case at bar. The first factor, strength of the mark, likely weighs in Plaintiff's favor. Defendant stated that the primary reason he created the Bukstel Domain, URL, and Website was to provide an updated website for individuals that were familiar with Plaintiff, but that were displeased with Plaintiff's website maintenance. It is therefore clear that it was precisely the recognizability of the Marks that led Defendant to create the "freedomcalls.us" domain name. *See New York State Soc. of Certified Pub. Accountants,* 79 F.Supp.2d at 341 (noting that the recognizability of the Society's mark led defendant to adopt the infringing "nysscpa.com" domain name).

Similarly, the fact that the Bukstel URL and Domain are nearly identical to Plaintiff's FREEDOM CALLS mark, provides—with respect to the second *Polaroid* factor— strong support for the conclusion that Defendant's use of the Plaintiff's Marks was likely to confuse consumers. Plaintiff's FREEDOM CALLS mark and Defendant's "freedomcalls.us" domain name are nearly identical. The only distinctions are the latter's lack of capitalization, the lack of a space between words, and the "us" that is necessary to designate a domain name. *Planned Parenthood,* 1997 WL 133313, at \*8. In addition to the distinctions noted above, the one additional distinction between the FREEDOM CALLS FOUNDATION mark and "freedomcalls.us" domain is the word "foundation." Finally, the degree of similarity between Defendant's "freedomcalls.us" domain and Plaintiff's "freedomcalls.org" domain is even stronger. *Id.*

Turning to the third factor, competitive proximity, the parties' respective web sites are both located on the World Wide Web, and the "sites compete for the same audience—namely, Internet users who are searching for a web site that uses [P]laintiff's mark as its address." *Planned Parenthood,* 1997 WL 133313, at \*8. Also, if Defendant were to reactivate the Bukstel Website, Plaintiff's and Defendant's websites would be in direct competition with each other. Those persons seeking Plaintiff's site with the intention of learning about its mission and services and who would be diverted to Defendant's site by means of the "freedomcalls.us" domain name may, indeed, end up using Defendant's services rather than Plaintiff's. Although it was not clear from the Bukstel Website, prior to its deactivation, whether or how Defendant has developed its own tele- or video-conferencing

infrastructure, it did appear that potential clients or volunteers could provide their contact information in order to "schedule a video connection" or "volunteer [a] location for connecting troops and families." *See* Pl.'s Hr'g Ex. 9 at 8. On this page, there was no link to information regarding Plaintiff; instead, an e-mail containing the freedomcalls.us domain name appeared. Persons diverted to Defendant's website were and have the potential to be not only be confused, but totally unaware that they are providing personal information to a service provider that is different from the one they initially sought out. Therefore, this Court finds that the third *Polaroid* factor tips in favor of Plaintiff.

**\*10** The fourth factor looks to whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, "bridge the gap." *Centaur Commc'n, 830 F.2d at 1227*. In the sense that the two sites are competing for the same users, that is, those looking for a web site that uses Plaintiff's Marks as its address, there is no gap to bridge. More broadly, it is clear that Plaintiff is not just likely to enter Defendant's "business"—it is a foregone conclusion because this is the exact same space that Plaintiff occupied before Defendant created his infringing website. This factor, therefore, carries no weight in the likelihood of confusion analysis.

The Court now turns to Plaintiff's evidence of actual confusion, the fifth *Polaroid* factor. Plaintiff has adduced compelling evidence that its Supporters and Clients are actually confused by Defendant's use of the Marks. Specifically, Harlow received a call from certain Supporters in Kentucky that were concerned about the content of an e-mail message they received from Defendant, which was sent using the Bukstel E-mail. (Harlow Decl. ¶ 18.) This message was sent by Defendant on November 23, 2005, after Defendant's termination. In sum and substance, this e-mail accused Harlow of cancelling scheduled video-conferences and threatening to discontinue services to certain geographic areas, making denigrating comments about troops and families, and embezzling cash from Plaintiff. (Harlow Decl., Ex. J at 1.) Because the FREEDOM CALLS mark appeared in the e-mail address used by Defendant, the Supporters believed that Bukstel was still affiliated with Plaintiff and therefore was authorized to send the e-mail. (Harlow Decl. ¶ 18.) As a result, Harlow had to provide clarifying information to these Supporters. (Harlow Decl. ¶ 18.) Therefore, this Court finds that the fifth Polaroid factor likely tips in favor of Plaintiff.

The sixth factor concerns whether Defendant adopted Plaintiff's Marks in good faith. This factor looks to whether Defendant adopted its mark with the intention of capitalizing on Plaintiff's reputation and goodwill. *New York State Soc. of Certified Pub. Accountants, 79 F.Supp.2d at 348* (citing *Lang v. Ret. Living Publ'g Co., Inc., 949 F.2d 576, 583 (2d Cir.1991)*) (internal quotations omitted). Further, Defendant's awareness of Plaintiff's use of a given mark to identify itself can give rise to an inference of bad faith, and this inference can be bolstered by the further finding that Defendant proffered no credible innocent explanation for the adoption of Plaintiff's Marks. *Id.* (citing *Centaur Commc'n, 830 F.2d at 1228*) (internal quotations omitted). The Court's earlier determination that Defendant intentionally copied the Marks is an indicator of bad faith. *See New York State Soc. of Certified Pub. Accountants, 79 F.Supp.2d at 348.* Furthermore, after receiving two cease and desist letters from Plaintiff's counsel, Defendant did not seek the advice of counsel. Rather, Defendant misconstrued demands made by Plaintiff's counsel in the August 29, 2005 cease and desist letter as "legal advice" [13] and consequently added a reference to Plaintiff's *www.freedomcalls.org* website to the Bukstel Website. (Def.'s Opp'n Mot. at 23.) Even if Defendant innocently relied on statements made by Plaintiff's counsel, this reliance was misplaced and is most likely insufficient to mitigate the inference of bad faith in this case.

[13]    The August 29, 2005 letter from Plaintiff's counsel states that Defendant's "[www.freedomcalls.us] website, which does not make reference to the [Plaintiff's] primary website, [ ] will only cause confusion for donors and others interested in the [Plaintiff's] work, and will interfere with the pursuit of the [Plaintiff's] mission." (Hr'g, Pl.'s Ex. 11.)

**\*11** Finally, Defendant has offered no credible innocent explanation of his adoption of Plaintiff's mark. As discussed above, Defendant adopted Plaintiff's Marks because he wanted Supporters and Clients to have a website that they found suitable. Based on the evidence before the Court, it is clear that Defendant had knowledge of the fact that using the Marks in the Bukstel URL, Website, Domain, and E-mail would allow him to capitalize off of the goodwill attached to Plaintiff's Marks. Therefore, this Court finds that Defendant most likely did not adopt Plaintiff's mark in good faith.

The Court now considers the seventh *Polaroid* factor, the quality of Defendant's product. As previously noted, the extent to which Defendant offers services is unclear.

However, if Defendant does offer services, then the services will almost certainly be inferior because he does not have the resources to provide the level of service provided by Plaintiff. The Court therefore finds that the seventh factor also likely weighs in favor of a finding of a likelihood of confusion.

Coming finally to the eighth factor, the sophistication of the consumers of the parties' respective services, a finding that the consumers are sophisticated "usually militates against a finding of a likelihood of confusion." *Centaur Commc'n, 830 F.2d at 1228.* However, when there is a high degree of similarity between the parties' services and marks, "the sophistication of the buyers cannot be relied on to prevent confusion." *Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 143 (2d Cir.1999) (citations omitted).

In this case, the users of the products and services offered by Plaintiff vary in their level of sophistication. Clearly, there are high-ranking government officials and technology service providers that are intimately familiar with Plaintiff, its mission, and presumably its website. However, the similarity between the parties' websites, e-mails, URLs, and domain names suggest that the sophistication of these consumers cannot be relied on to prevent confusion. *Id.* As for the "unsophisticated" consumer, there are also countless military personnel and military family members that may be unfamiliar with Plaintiff and may venture to the Internet to learn more about its products and services. These are the unsuspecting individuals that may come across the Bukstel Website and mistake it for one authorized by Plaintiff. As Harlow testified at the evidentiary hearing before this Court, the call notifying him of the Bukstel Website came from someone familiar with the organization. Although this unidentified caller was capable of observing the change in the website's presentation quality, the caller was unable to ascertain in the first instance that the Bukstel Website was not sanctioned by Plaintiff. Therefore, the Court finds that the sophistication of Plaintiff's Supporters and Clients is unlikely to save Defendant from a finding of a likelihood of confusion.

**\*12** Of the eight *Polaroid* factors, seven weigh in favor Plaintiff. One—the likelihood that Plaintiff will "bridge the gap"—is of no help to Defendant. Balancing the *Polaroid* factors and considering the presumption of confusion, the Court finds that the that Plaintiff has demonstrated that there is a significant likelihood of confusion among Plaintiff's current and prospective Supporters and Clients if Defendant were to continue to use Plaintiff's Marks.

As a defense to the Lanham Act unfair competition claim, Defendant asserts that the Bukstel Website was created in good faith. (Def.'s Opp'n Mot. at 2.) However, a "good faith defense is no defense" to a Lanham Act claim for unfair competition. *Gucci America, Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1065 (S.D.N.Y.1991). Therefore, this argument is of no avail to Defendant.

Having also found that Plaintiff's Marks have acquired secondary meaning, the Court holds that Plaintiff is likely to succeed on its unfair competition claim under § 43(a) of the Lanham Act.

*b. Cyber–Squatting in Violation of the Lanham Act (Count I)*

Plaintiff also alleges that Defendant violated the Anti–Cybersquatting Consumer Protection Act (the "ACCPA"), 15 U.S.C. § 1125(d)(1)(A), when he registered the domain "freedomcalls .us" and used that domain in the Bukstel URL. The ACCPA provides, in pertinent part, that a person shall be liable in a civil action by the owner of a mark if, without regard to the goods or services of the parties, that person:

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section and

(ii) registers, traffics in, or uses a domain name that-

\* \* \*

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark[.]

15 U.S.C. § 1125(d)(1)(A).

To succeed on a claim under the ACCPA, Plaintiff must prove that: (1) Defendant had a bad faith intent to profit from use of the Marks; (2) the Marks are either distinctive or famous; and (3) Defendant's domain name is identical or confusingly similar to Plaintiff's domain name. *See Sporty's Farm LLC v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 497–99 (2d Cir.2000).

The Court has already determined that both the FREEDOM CALLS and FREEDOM CALLS FOUNDATION marks are distinctive because they are, at the very least, descriptive marks. Therefore, Plaintiff has, most likely, proven the second factor of the ACCPA inquiry.

The Court must now consider whether the domain name "freedomcalls.us" is identical or confusingly similar to Plaintiff's Marks. When evaluating whether a domain name is confusingly similar to a mark, a district court disregards the top-level domain name (e.g. ".com", ".org", ".net" etc.). *Omega S.A. v. Omega Engineering, Inc.,* 228 F.Supp.2d 112, 126, n. 36 (D.Conn.2002) (citing *Sporty's Farm,* 202 F.3d at 497–98). Under the ACCPA, "whether a domain name is confusingly similar to a trademark is to be evaluated 'without regard to the goods or services of the parties.' " *Id.* (quoting 15 U.S.C. § 1125(d)(1)(A)). As discussed above, FREEDOM CALLS, as used by Plaintiff, and "freedomcalls" as used by Defendant differ by only the spaces between the words and capitalization. In addition to these minor distinctions, FREEDOM CALLS FOUNDATION, as used by Plaintiff, and "freedomcalls" as used by Defendant differ by only one word. The Court therefore concludes that Defendant's "freedomcalls.us" domain is confusingly similar to Plaintiff's Marks.

**\*13** Finally, the Court turns to the issue of whether Defendant acted with a bad faith intent to profit from Plaintiff's Marks when he registered the domain name "freedomcalls.us." The ACCPA lists nine factors to assist courts in determining whether a person has a bad faith intent to profit from the use of a mark. [14] 15 U.S.C. § 1125(d)(1)(B)(i). The Court is not limited, however, to considering just the listed factors when making a determination of whether the statutory criteria for bad faith have been met. *Sporty's,* 202 F.3d at 498. Rather, the factors are indicia that may be considered along with other facts. *Id.*

[14] The nine factors enumerated in the ACCPA are: (1) the trademark or other intellectual property rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by

creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).

After considering the facts of the case, the Court finds that Defendant did, most likely, have a bad faith intent to capitalize on the reputation and goodwill of Plaintiff when he registered the Bukstel Domain. First, Defendant did not have any cognizable intellectual property or trademark rights in freedomcalls.us at the time of its registration. *See* 15 U.S.C. § 1125(d)(1)(B)(I). In contrast, Plaintiff had a protectable intellectual property interest in the Marks and their use because it has exclusively and continuously used the Marks and the "freedomcalls.org" domain since September 2003. As a board member at the time he registered the Bukstel Domain, Defendant was fully aware of these facts.

The second and third ACCPA factors also likely weigh in favor of Plaintiff. With respect to the second factor, that is, the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person, it is clear that the Bukstel Domain name does not consist of the legal name of Defendant. The third factor, prior use of the domain name in connection with the bona fide offering of any goods or services, also cuts against Defendant because he did not create and use the site until

well after Plaintiff established and used the Marks and the "freedomcalls.org" domain.

As to the fourth factor, the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name, Defendant contends that his use of the Marks in the Bukstel Website is non-commercial. As of the date of this opinion, the Bukstel Website contains absolutely no text, much less the offering of products or services that give rise to commercial activity. However, as the Court previously noted, the prior version of the Website seemed to suggest that visitors could schedule video- and tele-conferences by using the site, thus giving rise to an inference of commercial activity. At best, this factor is neutral as to Plaintiff and Defendant.

The fifth ACCPA factor, the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, also likely tips in favor of Plaintiff. As previously noted, Defendant admitted that he created the Bukstel Domain Website to provide a space that would be more suitable to complaining Supporters and Clients. This statement makes clear that Defendant intended to divert Supporters and Clients from Plaintiff's website to his own. Moreover, this diversion has the potential to harm the goodwill represented by Plaintiff's Marks because it creates a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Bukstel Domain and Website. Although the Bukstel Website, at the time this action was brought, did not contain any text or other materials that were necessarily "tarnishing" or "disparaging," 15 U.S.C. § 1125(d)(1)(B)(V), and it is unclear whether Defendant realized any "commercial gain," *id.,* the Court does not naively believe, given the acrimony between Plaintiff's board of directors and Defendant, that there is no possibility that either situation could occur in the very near future. In light of these considerations, the Court finds that Defendant, most likely, created the Bukstel Domain and Website with a bad faith intent to divert users from Plaintiff's website to his own.

**\*14** Based on the foregoing, this Court finds that Plaintiff has produced sufficient evidence that it is likely to succeed on its ACCPA claim.

### c. New York General Business Law (Count Four)

Plaintiff alleges that Defendant's use of the Marks injured Plaintiff's business reputation and subjected the Marks to dilution, in violation of New York General Business Law § 360–1. To succeed on this claim, Plaintiff must show (1) that

the trademark is truly distinctive or has acquired secondary meaning and (2) a likelihood of dilution either as a result of blurring or tarnishment. *Strange Music, Inc. v. Strange Music, Inc.,* 326 F.Supp.2d 481, 496 (S.D.N.Y.2004).

"Dilution by 'blurring' may occur where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Tommy Hilfiger Licensing Inc. v. Nature Labs LLC,* 221 F.Supp.2d 410, 421 (S.D.N.Y.2002) (citation omitted). It typically involves "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products." *Id.* at 421–22 (citation omitted). Blurring under New York law is assessed by a six factor test: (1) similarity of the marks, (2) similarity of the products covered; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. *Katz v. Mordiri,* 283 F.Supp.2d 883, 901 (S.D.N.Y.2003). Although a likelihood of confusion is not necessary to find dilution, and indeed may be inconsistent with such a finding,[15] many of the factors relevant to likelihood of confusion are also relevant to likelihood of dilution. *Tommy Hilfiger Licensing,* 221 F.Supp.2d at 422.

[15] "The state of mind required for confusion and dilution are distinct and inconsistent. Confused consumers believe that the actor's use of the mark indicates a connection with the trademark owner, and thus for those consumers, the actor's use does not dilute the distinctiveness of the mark." *Tommy Hilfiger Licensing,* 221 F.Supp.2d at 422 (citation omitted).

Here, the Court has already determined that the Marks have secondary meaning. Further, the Court also finds that there is a likelihood of dilution as a result of blurring because each of the blurring factors has been discussed both in the context of the *Polaroid* analysis and in the ACCPA analysis and both have been resolved in Plaintiff's favor. Therefore, the Court finds that Plaintiff is likely to succeed on its New York law claim for injury to business reputation or dilution.

### d. Misappropriation of Trade Secrets (Count VIII)

Plaintiff alleges that Defendant misappropriated a trade secret when he "possessed, used, and exploited the Supporter & Client List and the information contained therein" by using it to obtain the e-mail addresses of Plaintiff's Supporters

and Clients and, thereafter, e-mailing those individuals. (Am.Compl. ¶ 67.) To date, Plaintiff has presented evidence that Defendant contacted Supporters and Clients, from the Bukstel E-mail, on November 23, 2005, December 6, 2005, and January 13, 2006. (Harlow Decl., Ex. J; Pl.'s 1/18/2006 Ltr., Ex. A.) In the November 23, 2005 e-mail, Defendant contacts more than 20 individuals regarding the allegedly unlawful acts of Harlow. (Harlow Decl., Ex. J.) Specifically, this message included accusations that Harlow threatened to cancel various scheduled videoand/ or tele-conferences, embezzled monies from Plaintiff, made derogatory statements about military personnel, and held less-than-successful fundraisers. (*Id.*) The December 6, 2005 e-mail made similar accusations. (*Id.*) The January 13, 2006 message, sent to two individuals, accused Harlow of providing perjurious testimony at the January 12 evidentiary hearing. (Pl.'s 1/18/2006 Ltr., Ex. A.)

**\*15** At the evidentiary hearing, Harlow testified that the identities of the Supporters and Clients are only revealed to "[p]eople associated with [Plaintiff] internally and external parties ... on a need-to-know basis" and thus are trade secrets. (Hr'g Tr. 75:20–21.) Defendant counters on the ground that third-parties had access to the list of Supporters and Clients. (Def.'s Opp'n Mot. at 5.) For this proposition, Defendant avers that Supporters and Clients often referred third-parties to Plaintiff, which demonstrates that the Supporter & Client List is not a trade secret. (*Id.*) Defendant also argues that, because Plaintiff's website lists locations and contact persons that have volunteered or supplied equipment to Plaintiff, Plaintiff has made the contents of the Supporter & Client List public and therefore cannot claim that the list is a trade secret. (Def.'s Opp'n Mot. at 5.)

Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999) (citations and internal quotation marks omitted). In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease

or difficulty with which the information could be properly acquired or duplicated by others. *Id.* (citation omitted).

"A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *North Atlantic Instruments, Inc.,* 188 F.3d at 44 (citations and internal quotation marks omitted). "The question of whether or not a customer list is a trade secret is generally a question of fact." *Id.*

Based on the *North Atlantic Instruments* factors, this Court finds that Plaintiff's likelihood of success on its misappropriation claim is considerable because the personal information contained in the Supporter & Client List likely constitutes a trade secret. Four of the six factors weigh in favor of such a conclusion. With respect to the first factor, the contact information contained in the Supporter & Client List, that is, the telephone numbers, e-mail addresses, and other personal information for families, soldiers, and others, is not known outside of the business, which weighs in favor of a trade secret determination. (Hr'g. Tr. 73:16–18.) Although Plaintiff provides a list of Supporter and Client *entities* that can be found on the public website, the personal contact information for *individuals* at these Supporter and Client organizations is not disclosed. *Cf. Leo Silfen, Inc. v. Maurice C. Cream et al.,* 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (N.Y.1972) (holding that preliminary injunction should not issue because, *inter alia,* plaintiff's customers were readily ascertainable as likely prospects).

**\*16** When considering the fourth factor, it is clear that Supporter and Client contact information is critical to Plaintiff's business, as it allows Plaintiff to solicit support to carry out its mission. Moreover, consideration of the fifth factor reveals that Plaintiff has expended a great deal of resources in developing its network of Supporters and Clients, as evidenced by the products of its efforts. Plaintiff has had to develop a reputation with both military officials and families in order to acquire the video- and tele-conferencing equipment, locations, and participants needed for its activities. Finally, with respect to the sixth factor, it would be rather difficult for one to acquire or duplicate Plaintiff's efforts because the personal contact information for individuals within the Supporter & Client List is not publicly available.

The remaining two *North Atlantic Instruments* factors, although not weighing in favor of a trade secret finding, do not require the opposite result. For the second factor, Plaintiff affirmed that contact information for Supporters and Clients were only distributed on a "need to know" basis, therefore, information was readily available to those involved in Plaintiff's business. (Hr'g Tr. 88:15–20.) However, Plaintiff did not require that employees sign confidentiality agreements, which cuts against a trade secret finding. With respect to the third factor, it is unclear whether Plaintiff used security measures to guard its Supporter & Client List; however, it *is* clear that the contents were not widely published and dissemination of such information was bridled. Of course, Defendant's contacts may have been the product of "casual memory," *Leo Silfen, Inc.,* 328 N.Y.S.2d 423, 278 N.E.2d at 639, which cuts against a trade secret finding; however, such a finding in this case would not exempt Defendant's actions from potential liability.

In light of the fact that the November 23, 2005, December 6, 2005, and January 13, 2005 e-mail messages were sent from the Bukstel E-mail, which the Court has established is likely to cause confusion about Defendant's affiliation with Plaintiff, and the *North Atlantic* factors considered above, the Court considers its finding that Plaintiff will likely succeed on its trade secret claim to be valid.

### e. Breach of Fiduciary Duty (Count VII)

Plaintiff also alleges that Defendant breached his fiduciary duties while serving as an officer, director, and employee of Plaintiff by engaging in conduct that was not in Plaintiff's best interests. Specifically, Plaintiff asserts that Defendant breached his fiduciary duties by registering and using the Bukstel Website; using information from the Supporter & Client List; diverting business relationships from Plaintiff; and defaming Plaintiff and members of the Board. (Am.Compl.¶ 60.)

Generally, shareholders, officers, and employees of a corporation have a "duty to deal fairly, in good faith, and with loyalty to the corporation and other shareholders." *Am. Fed. Group, Ltd. v. Rotherberg,* No. 91 CV 7860, 2003 WL 22349673, *1, *10 (S.D.N.Y. Oct.14, 2003).* New York law codifies these common law fiduciary duties for non-profit organizations and provides that "directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." N.Y. NOT–FOR–PROFIT CORP. § 717(a).

**\*17** An employee's fiduciary duty may continue after termination of the employment relationship. *Am. Fed. Group, Ltd.,* 2003 WL 22349673, at *13. Such a continuing duty may, in appropriate circumstances, include the specific duty not to divert business in which a former employer has the requisite "tangible expectancy," and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment. *Am. Fed. Group, Ltd.,* 2003 WL 22349673, at *13 (citations omitted).

In this case, Plaintiff is likely to succeed on its breach of fiduciary duty claim as it relates to Defendant's ongoing actions. Although Defendant has a right to "compete with his former employer as to matters for which he has been employed," *AGA Aktiebolag v. ABA Optical Corp.,* 441 F.Supp. 747, 754 (E.D.N.Y.1977), he is "not free to exploit the same trade if the opportunity was facilitated by acts of preparation and disloyalty during his employment" and before his termination and "by the breach of his obligation to use his best efforts in the interest of his employer," *id.* At the very least, by (1) registering and using the Bukstel Website prior to his termination, thus potentially diverting website users from Plaintiff's website to his own and (2) using the contact information obtained from the Supporter & Client List while still employed by Plaintiff to disseminate, post-termination, information about Plaintiff's alleged operational difficulties and the alleged unlawful activities of Plaintiff's directors, Defendant has at the very least challenged Plaintiff's efforts to carry out its mission. Indeed, Plaintiff has had to engage in "damage control" with its Supporters and Clients as a result of Defendant. (Pl.'s Mem. Law. Supp. Mot. Prelim. Injunc. at 18.) Therefore, Defendant has demonstrated a lack of good faith and fair dealing.

### e. Defamation (Count X)

Plaintiff alleges that Defendant is liable for defamation *per se* because he conducted an "ongoing campaign" of distributing "knowingly false, fraudulent, libelous, and defamatory statements" about Plaintiff and Harlow to Supporters and Clients. (Am.Compl.¶ 82.) In order to succeed on this claim, Plaintiff must show the following elements: (1) a false statement, (2) published without privilege or authorization to a third party, (3) constituting fault as judged by, at a minimum, a negligence standard, and (4) that such publishing

either caused special harm or constituted defamation *per se.* *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 7 (N.Y.App.Div.1999). Under New York law, truth is a complete defense to a defamation claim. *Diaz v. Espada,* 8 A.D.3d 49, 778 N.Y.S.2d 38, 40 (N.Y.App.Div.2004).

Whether a statement is susceptible of a defamatory construction is a question of law. *Van–Go Transp. Co. v. New York City Bd. of Educ.,* 971 F.Supp. 90, 98 (E.D.N.Y.1997) (citations omitted). In making this determination, the court is not to seek out a defamatory meaning:

> **\*18**  The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction.

*Id.*

Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties. *Id.* Because a statement impugning the plaintiff's business reputation is the libel *per se* form of defamation, special damages need not be pled. *Id.*

In this case, the Court finds that Plaintiff is likely to succeed on its defamation claim because Defendant issued statements that likely constitute libel *per se.* In order to analyze the defamation claim, the Court will consider each of the challenged e-mail communications in turn.

### (1) November 23, 2005 E-mail

On November 23, 2005, Defendant sent an e-mail to a distribution list containing approximately 22 e-mail addresses. Defendant stated that "Harlow decided to cancel a[n] xMas party for families" and that during the previous year "Harlow threatened to cancel family connections and denigrated the Oregon National Guard." (Harlow Decl ., Ex. J.) Defendant also states that Harlow has "used the emotions of families and military folks to wield leverage in an

unconscionable manner," has made "denigrating comments" and engaged in denigrating "treatment of [ ] troops and families." (*Id.*) In this same message, Defendant also asserts that Harlow canceled other family connections and that Harlow deemed a fund-raising event a failure because it raised less than $1,000 in donations. (*Id.*) Finally, Defendant says that his vision has been "perverted by Harlow." (*Id.*) Defendant closes the November 23, 2005 message by signing off as "Founder" of Plaintiff. (*Id.*)

Taken as a whole, this e-mail is defamatory because it impugns Plaintiff's business. Specifically, the cancellation allegations create a perception among Plaintiff's Supporters and Clients that Plaintiff is either unwilling or unable to provide its promised services. Further, the e-mail imputes fraud and other misconduct to Plaintiff's directors. Plaintiff has not, to date, produced credible evidence going to the truth of these allegations. Additionally, Defendant published this message to third-parties without Plaintiff's authorization, without an investigation into the accuracy of the statements, and (seemingly) with an intent to inflict harm on Plaintiff and its directors. Therefore, it is reasonable for this Court to find that Defendant most likely acted maliciously. *See World Wrestling Fed'n Entm't, Inc. v. Bozell,* 142 F.Supp.2d 514, 528 (S.D.N.Y.2001) (defining common law malice as acting with "spite, ill will, hatred, or the intent to inflict harm"). Finally, as discussed above, the statements contained in the November 23, 2005 e-mail constitute libel *per se* because they relate to Plaintiff's business reputation. Based on this analysis, Plaintiff is likely to succeed on its defamation claim as to this e-mail.

### (2) December 6, 2005 E-mail

**\*19**  On December 6, 2005, Defendant sent an e-mail containing additional allegations about Plaintiff and its directors to two individuals, both of whom appear to be Supporters. (Harlow Decl., Ex. J.) In addition to referencing cancelled family connections, similar to the November 23 e-mail, Defendant distributed a memorandum of understanding (the "MOU") sent by Harlow, on behalf of Plaintiff, to another non-profit organization. Defendant admonished the contents of the MOU, stating that it "request[ed] 90% of Operation America's donation in exchange for [Plaintiff's] services." (*Id.*) Defendant goes on to say the following:

> Just as I thought the taking of Cash out of the Freedom Calls Bank account and the auditors declining to

certify the foundations financials was questionable. I cannot believe these latest actions. [sic]

(*Id.*)

The Court's analysis with respect to the November 23 e-mail applies with equal force here. Therefore, the Court finds that Plaintiff is likely to succeed on its defamation claim as to the December 6, 2005 message.

(3) January 13, 2006 E-mail

Finally, on January 13, 2006, one day after Defendant appeared before this Court for an evidentiary hearing on the pending preliminary injunction motions, Defendant again contacted the same two Supporters that were the recipients of the December 6, 2005 e-mail. In this communication, Defendant informed the e-mail recipients that "Harlow lied his way through court and told the Judge that troops didn't mind that he said KIA's would help them (military families) wake up and smell the coffee." (Pl.'s 1/18/2006 Ltr to Court, Ex. A.) In this message, Defendant also forwarded an e-mail sent from Harlow to Defendant and to three other mail recipients regarding contributions and operations. (*Id.*) The message from Harlow was sent on March 10, 2005 and, *inter alia*, informed its recipients that Defendant would be focusing on marketing rather than operations and provided detailed information on corporate contributions and new technology installations. (Pl.'s 1/18/2006 Ltr to Court, Ex. A.) Defendant stated that the "e-mail is what one can expect to receive from [Harlow] as a board member" and further alleges that the contents of the e-mail are not true and that Harlow "does not care about military families" and will "lie as he did in [ ] court." (*Id.*)

The analysis for the November 23, 2005 and December 6, 2005 e-mails applies with equal force here. Therefore, the Court finds that Plaintiff is likely to succeed on its defamation claim as to the January 13, 2006 message. Moreover, given the recency of Defendant's communications, the Court finds that there is a risk that Defendant's defamatory communications will occur on an ongoing basis.

Plaintiff also brings a separate defamation cause of action based on trade libel. This form of defamation relates to the disparagement of a business' goods or services. *World Wrestling Fed'n Entm't, Inc.,* 142 F.Supp.2d at 532. To state a claim for trade libel, the plaintiff must allege that a defendant (1) made false, defamatory statements, (2) to a third party, (3) with malice, and (4) that it suffered special damages. *Id.* To the extent the claim alleges an injury to the business's reputation and not the product, it is the libel *per se* form of defamation and special damages need not be shown. *Aequitron Med. v. Dyro,* 999 F.Supp. 294, 297 (E.D.N.Y.1998). Given the similarities between the libel *per se* and trade libel elements of proof, the defamation analysis for reputational injury provided above applies with equal force to Plaintiff's trade libel claim. Therefore the Court finds that Plaintiff is likely to succeed on its trade libel claim.

*f. Tortious Interference with Business Relations (Count IX)*

**\*20** In this count of the Complaint, Plaintiff alleges that Defendant unlawfully interfered and continues to interfere with Plaintiff's business relationships with Supporters and Clients by (1) using the Supporters & Client List and other trade secrets and (2) defaming Plaintiff's goodwill, reputation, and operations during his solicitations to Plaintiff's Supporters and Clients. (Am.Compl.¶ 75.) These allegations give rise to two separate causes of action: tortious interference with *prospective* business relations and tortious interference with *existing* contractual relations.

(1) Tortious Interference with Prospective Business Relations

To establish a claim for tortious interference with prospective business relations, a plaintiff must prove: (1) there was a business relationship with a third party; (2) defendants knew of that relationship and intentionally interfered with it; (3) defendants either acted "solely out of malice" or used "wrongful means;" and, (4) defendants' interference caused injury to the relationship with the third-party. *Carvel Corp. v. Noonan,* 350 F.3d 6, 17 (2d Cir.2003).

With respect to the first factor provided in *Carvel,* the Court finds that Plaintiff did have business relationships with the parties to whom Defendant sent the challenged e-mails. Based on the Court's review of these e-mails, Defendant contacted Supporters and Clients that have a vested interest in the mission and the products and services offered by Plaintiff. With respect to the second factor, Defendant, as a former board member, officer, and employee of Plaintiff, had knowledge of these business relationships. Indeed, Defendant used his knowledge of Plaintiff's relationships with certain Supporters and Clients to determine his target audience and to

craft the text of the November 23, 2005, December 6, 2005, and January 13, 2006 e-mails. Defendant also likely interfered with Plaintiff's business by establishing a confusingly similar website.

For the third factor, there is a distinction between generic instances of interference and those special (although more frequently encountered) instances in which the plaintiff and defendant are market competitors. *Carvel Corp.,* 350 F.3d at 18 (citation omitted). If the plaintiff claims that a *non-competitor* interfered with its prospective economic relations, then the defendant should be liable where its interference was merely "improper." *Id.* (emphasis added and citation omitted). The factors in determining whether interference is improper include the nature of the defendant's conduct, the defendant's motive, the interests of both parties, the social interests in competition and the sanctity of contract, the degree to which the defendant's conduct caused the interference, and the relationship between the parties. *Carvel Corp.,* 350 F.3d at 18 (citation omitted). In further defining the "nature of defendant's conduct" factor, the commentary to the Restatement (Second) of Torts, § 767, lists several different examples of improper conduct. *Id.* Of particular relevance to this case is the specific suggestion that a defendant's conduct is improper when it is in "violation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods." *Id.*

**\*21** In contrast, if the plaintiff claims that a *competitor* interfered with its prospective economic relations, then the liability should only attach where the defendant employed wrongful means. *Id.* at 19. In this context, wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract. *Id.*

Here, an analysis as to whether Defendant is a "competitor" or not would be academic, as his communication with Plaintiff's Supporters and Clients are tortious under both the "improper conduct" and the less stringent "wrongful means" standard. After considering the guidance provided by the Second Circuit in *Carvel,* this Court determines that Defendant's conduct is improper because Defendant violated recognized ethical codes for a particular area, that is, non-profit organizations. As established in Section I.B. (1)(d), Defendant owed duties of good faith and fair dealing

to Plaintiff as both a current and former director; these duties were debunked by Defendant. Even if Defendant were truly concerned about the management of Plaintiff, distribution of such information using a confusingly similar e-mail address (the Bukstel E-mail), post-termination, and establishment of a confusingly similar website (the Busktel Website) demonstrate that Defendant's course of action was not the most prudent. Further, Defendant's actions are, most likely, wrongful because he misrepresented the operational and financial viability of Plaintiff in the November 23, 2005, and December 6, 2005 e-mails.

Finally, Plaintiff alleges that Defendant has injured its prospective business relationships because of the denigrating e-mails that have been sent to Supporters and Clients. Although Plaintiff has averred that it has had to engage in "damage control" by explaining and/or responding to comments made by Defendant, Compl. ¶ 77, which is sufficient for pleading purposes, Plaintiff has produced insufficient evidence of injury. To date, Plaintiff has not demonstrated that any Supporters or Clients have withdrawn their support, in part or in full. To the extent that Defendant ever offered services similar to Plaintiff's on the Bukstel Website, Plaintiff has not shown a loss of sales or business as a result of Defendant's actions. At present, there is only one allegation that even remotely constitute "injury"—that Plaintiff has had to answer "certain calls from Supporters in Kentucky who were concerned about the content of [Defendant's] e-mail." (Harlow Decl. ¶ 18.) Accordingly, Harlow has had to explain to the callers that Defendant no longer works for Plaintiff and is no longer authorized to send e-mails on behalf of Plaintiff. (*Id.*) Although inconvenient, it appears to this Court that Plaintiff has managed, thus far, to mitigate any injury that could have been caused by Defendant's actions. *See, e.g., Unique Sports Generation, Inc. v. LGH–III, LLC,* 03 CV 8324, 2005 U.S. Dist. LEXIS 22133, *1 (S.D.N.Y. Sept. 30, 2005) (noting that allegations of lost sales and loss of one customer sufficient to show injury); *Highland Capital Mgmt., L.P. v. Schneider,* No. 02 CV 8098, 2005 U.S. Dist. LEXIS 14912, *1, *74 (S.D.N.Y. July 26, 2005) ("[The] interference must be direct interference with a third party, that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.")

(2) Tortious Interference with Existing Contractual Relations

**\*22** To prove tortious interference with existing contractual relations, Plaintiff must show that a defendant intentionally

procured a third-party's breach of an existing contract with Plaintiff. *See Atla–Medine v. Crompton Corp.,* No. 00 Civ. 5901, 2001 U.S. Dist. LEXIS 1621, *1, *7 (S.D.N.Y. Feb. 21, 2001) (citations omitted). Plaintiff has not met this burden, as it has produced no evidence that parties to existing contracts have breached their obligations as a result of Defendant's allegedly unlawful conduct. Therefore, Plaintiff is not likely to succeed on this claim.

Given the evidence currently available for its review, the Court finds that Plaintiff is not likely to succeed on its claim for tortious interference with prospective business relations. However, there are, arguably, sufficient questions going to the merits to make this claim a fair ground for litigation, especially given that Plaintiff can rebut the Court's finding on the injury prong with a showing of contrary proof.

### 2. *Immediate Irreparable Injury*

In considering Plaintiff's request for a preliminary injunction based on its Lanham Act unfair competition claim, the requirement of irreparable harm is unnecessary because a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988). Here, the Court has established that a likelihood of confusion exists; thus, irreparable harm has also been established. Therefore, a preliminary injunction shall issue with respect to this claim.

Following other district courts of the Second Circuit, this Court also finds that irreparable harm may be presumed for the Lanham Act cyber-squatting claim because Plaintiff has shown a likelihood of success on the merits. *See 1–800 Contacts, Inc. v. WhenU.com,* 309 F.Supp.2d 467, 506–7 (S.D.N.Y.2003), *rev'd on other grounds,* 414 F.3d 400, 2005 (2d Cir.2005).

In light of the analytical similarities between the Lanham Act unfair competition claim and the New York state law dilution claim, and the fact that there is a presumption of irreparable harm in favor of Plaintiff from the Lanham Act claim unfair competition claim, the Court finds that Plaintiff has established irreparable harm with respect to the analogous state law claim.

The activities that Plaintiff challenges in its breach of fiduciary duty claim, namely, registering and using the Bukstel Website; using information from the Supporter & Client List; diverting business relationships from Plaintiff;

and defaming Plaintiff and members of the Board, are each addressed separately herein. Therefore, the Court shall not engage in an independent analysis of harm for this claim.

As to Plaintiff's defamation claim, "for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases." *Metropolitan Opera Ass'n v. Local 100, Hotel Emples. & Restaurant Emples. Int'l Union,* 239 F.3d 172, 177 (2d Cir.2001). Even when such extraordinary circumstances are present, the Second Circuit has recognized that "current First Amendment principles may prohibit granting an injunction" because "prior restraints [on expression] are the most serious and the least tolerable infringement on First Amendment rights." *Metropolitan Opera Ass'n,* 239 F.2d at 176–7 (citations omitted). Courts are therefore reticent to grant injunctions based on defamation because "prior restraint [in] the form of a court-issued injunction [increases] the risk of infringing on speech protected under the First Amendment." *Id.* at 176 (citations omitted). In this case, the fact that Defendants false statements about Plaintiff's business and about its directors may injure Plaintiff does not alone constitute a sufficient ground for issuance of an injunction because Plaintiff has an adequate remedy at law. *See Bynog v. SL Green Realty Corp.,* No. 05 CV 0305, 2005 U.S. Dist. LEXIS 34617, *1, *10 (S.D.N.Y. Dec. 22, 2005) (citations omitted).

**\*23** For Plaintiff's claim for misappropriation of trade secrets, irreparable harm is presumed where a trade secret has been misappropriated, even in the absence of an employment agreement. *Johnson Controls, Inc. v. A.P.T. Critical Sys.,* 323 F.Supp.2d 525, 533 (S.D.N.Y.2004). Therefore, a preliminary injunction shall issue with respect to this claim.

As to the claim of tortious interference with existing contractual relations, the Court declines to issue a preliminary injunction at this juncture because Plaintiff has not established a likelihood of success. For tortious interference with prospective business relations, Plaintiff has presented sufficient questions going to the merits of this count and the balance of hardships tips in Plaintiff's favor. However, the paucity of evidence regarding Plaintiff's actual loss vitiates a finding of irreparable harm and therefore a preliminary injunction shall not issue.

### 3. *Unclean Hands*

In response to Plaintiff's preliminary injunction motion, Defendant asserts the affirmative defense of unclean hands

and accordingly alleges that Plaintiff acted in bad faith by committing its own Lanham Act violations. (Def.'s Opp'n Mot. at 3.) Specifically, Defendant alleges that Plaintiff modified and placed articles copyrighted by news publications on Plaintiff's website, to the detriment of Defendant. (Hr'g Tr. 124–128.) For example, Defendant contends that Harlow took an article that was originally printed in the *Akron Beacon Journal* and that identified Defendant as a "founder" of Plaintiff, changed Defendant's description to "co-founder," and then placed the modified article on Plaintiff's website. (Hr'g Tr. 125–127.) Defendant also testified that Harlow admitted that such modifications took place. Defendant asserts that such changes occurred in order that Plaintiff minimize his involvement in Plaintiff's founding.

Because a court sitting in equity is a vehicle for affirmatively enforcing the requirements of conscience and good faith, a party who comes into equity must come with clean hands if relief is to be granted. *Gidatex v. Campaniello Imports, Ltd.,* 82 F.Supp.2d 126, 130 (S.D.N.Y.1999) (citations and internal quotation marks omitted). The defendant who invokes the doctrine of unclean hands has the burden of proof. *Id.* Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior. *Id.* at 131; *see, e.g., Goldstein v. Delgratia Mining Corp.,* 176 F.R.D. 454, 458 (S.D.N.Y.1997) (stating that unclean hands defense successful where plaintiff made multiple misrepresentations to court regarding law and facts); *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,* 792 F.Supp. 969, 970 (S.D.N.Y.1992), *aff'd by summary order,* 983 F.2d 1048 (2d Cir.1992) (finding that defendant's unclean hands barred laches defense in trademark dispute where defendant's president fabricated testimony to create impression that he detrimentally relied on plaintiff's acquiescence). However, the alleged unconscionable behavior must be *related to the matter at issue* to the detriment of the party opposing the motion for injunctive relief. *Id.* (citations and internal quotation marks omitted).

**\*24** The Court finds that Defendant has not met his burden of proof with respect to the unclean hands defense. First, even if Defendant's allegations regarding Plaintiff's alleged copyright infringement were true, they do not rise to the level of bad faith or unconscionability contemplated by the unclean hands defense. Plaintiff's alleged unlawful actions do not involve fabrications under oath or misrepresentations to the Court. [16] Moreover, Defendant's allegations of bad faith are

not sufficiently related to Plaintiff's unfair competition claim to justify an unclean hands defense. First, Defendant does not allege that Plaintiff's alleged inequitable conduct relates to Plaintiff's development and use of the FREEDOM CALLS and FREEDOM CALLS FOUNDATION marks. The claim asserted by Plaintiff is that of an owner with the exclusive right to use its marks. Rather, Defendant's allegations relate to Plaintiff's allegedly unlawful modification of copyrighted material belonging to other businesses. Consequently, even if Plaintiff has unclean hands, Defendant cannot prove that Plaintiff tainted its hands in its use of the Marks or in bringing this suit to enforce its rights against Defendant. *See Gidatex,* 82 F.Supp.2d at 132.

[16]    On January 18, 2006, Defendant filed an Order to Show Cause Contempt of Court and Perjury (the "Contempt Motion"), alleging that Harlow fabricated testimony regarding his technology certifications during the evidentiary hearing held before this Court. Defendant subsequently filed a Supplement to Contempt of Court Motion for Perjury, which alleged that Harlow also fabricated the date on which he became an employee of Plaintiff. Although the Court has not issued its opinion on the Contempt Motion and its supplement, the Court notes that Defendant's allegations, even if true, do not undermine the credibility of the evidence produced by Plaintiff in support of its motion for a preliminary injunction. In contrast to the fabricated testimony presented to the *Aris–Isotoner Gloves, Inc.* court and the misrepresentations made to the *Goldstein* court, any untruths related to Harlow's technological expertise and the start date of his employment will have no impact on the procedural posture and substantive merits of Plaintiff's case. Therefore, the outstanding nature of the Contempt Motion and its supplement do not affect this Court's finding that Defendant has failed to meet his burden with respect to the unclean hands defense.

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is hereby granted in part and denied in part.

## II. *DEFENDANT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION*

Defendant moves for a temporary restraining order ("TRO") and preliminary injunction based on his counterclaims

against Plaintiff and third-party claims against Harlow and Kate Green ("Green"), a director, Secretary, and Treasurer for Plaintiff. Specifically, Defendant asks this Court to (1) restrain Plaintiff, Harlow and Green from making cash withdrawals from Plaintiff's account and utilizing the *ebukstel@freedomcalls.org* e-mail account and (2) require Plaintiff to turn over to Defendant (a) all e-mails sent to and from the *ebukstel@freedomcalls.org* e-mail account since November 8, 2005; (b) all e-mails received and sent from the *jharlow@freedomcalls.org* e-mail account since October 4, 2005; and (c) evidence of cash withdrawals from Plaintiff's bank account from 2004 to December 2005. Defendant's TRO and preliminary injunction requests are based on allegations that (1) Harlow and Greene are subject to liability for embezzlement, misappropriation, filing fraudulent tax returns, and breach of fiduciary duty and (2) Harlow is liable for defamation for improperly using the *ebukstel@freedomcalls.org* e-mail account to distribute the fraudulent tax documents.

A. Standard for Granting a Temporary Restraining Order and Preliminary Injunction

The standards for issuing a TRO is the same as that governing the granting of preliminary injunctive relief. *Harris v. Diaz,* No. 04 CV 9124, 2004 U.S. Dist. LEXIS 25256, *1, *8 (S.D.N.Y. Dec.13, 2004) (citations omitted). The standard for granting preliminary injunctive relief, discussed *supra* in Section I, applies with equal force here.

B. Application of the TRO and Preliminary Injunction Standard

1. *Likelihood of Success on the Merits*

**\*25** Defendant contends that Harlow and Green conspired to file, and knowingly filed, a 2004 tax return with the Internal Revenue Service on behalf of Plaintiff that contained fraudulent statements and material omissions, in violation of 26 U.S.C. § 7206(1). (Def.'s TRO Mot. [17] ¶¶ 1, 21, 22.) Defendant also contends that Harlow and Green untimely filed Plaintiff's 2004 tax return with the Charities Bureau of the New York Attorney General's Office. (*Id.* at ¶ 12.) Defendant further alleges that Harlow and Green conspired to embezzle money from Plaintiff, engaged in acts of self-dealing, and withheld documentation from Defendant while he served on Plaintiff's board of directors, in breach of their fiduciary duties. (*Id.* ¶ 23, 32.)

[17]     Citations to "Def.'s TRO Mot." refer to Defendant's Motion for Temporary Restraining Order and Preliminary Injunction, unless otherwise noted.

Defendant also contends that Plaintiff, Harlow, and Green are liable for defamation because they used the *ebukstel@freedomcalls.org* account after his termination to respond to e-mail messages and to disseminate the allegedly fraudulent tax returns after his termination. (Def.'s TRO Mot. at ¶ 14.) Defendant also avers that "Harlow is misleading the public by sending out misleading information from his e-mail account at [ ] *jharlow @freedomcalls.org."* (*Id.* at ¶ 26.)

*a. Misappropriation, Embezzlement, and Breach of Fiduciary Duty*

To meet Article III's constitutional requirements for standing, a plaintiff must allege an actual or threatened injury to himself that is fairly traceable to the allegedly unlawful conduct of the defendant. *Lamar Adver. of Penn., LLC v. Town of Orchard Park,* 356 F.3d 365, 373 (2d Cir.2004) (citations and internal quotation marks omitted). Furthermore, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.*

The Court finds that Defendant does not have Article III standing to bring the misappropriation, embezzlement, and breach of fiduciary duty claims described herein because he has not sufficiently pled injury. Defendant has not demonstrated how the allegedly unlawful actions of Harlow and Green have resulted in any actual or threatened injury to Defendant. Although Defendant's allegations, if true, would almost certainly give rise to reputational damage with respect to Plaintiff, Harlow, and Green, no such injury can accrue to Defendant when he is no longer affiliated with Plaintiff. Therefore, Defendant is not likely to succeed on the merits of these claims. Moreover, without standing, there are insufficient questions regarding the merits of Defendant's claims to make them a fair ground for litigation.

Moreover, New York law provides that directors and officers may only bring an action against another director or officer for certain violations of duties if the director making the allegations occupies his office *at the time the action is brought.* See N.Y. NOT–FOR–PROFIT CORP. § 720(b) (1) ("[A]n action may be brought for the relief ... in the right of the corporation, by ... [a] director or officer of the corporation[.]"); *Tenney v. Rosenthal,* 6 N.Y.2d 204, 189 N.Y.S.2d 158, 160 N.E.2d 463, 468 (N.Y.1959) ("[T]he action, *properly commenced by the plaintiff when he was*

*a director,* may not be defeated, either on the theory of abatement or of lack of capacity to sue, by effecting the plaintiff's ouster as director.") (emphasis added). When Defendant filed his counterclaims in this action on December 14, 2005, he was no longer affiliated with Plaintiff and thus cannot bring an action based on Harlow and Green's alleged misappropriation, embezzlement, and breach of fiduciary duty claims. Additionally, because Defendant was not a member, holder or owner of the corporation at the time the action was brought, he is also unable to bring these claims under the auspices of a member's derivative action. *See* N.Y. NOT–FOR–PROFIT CORP. § 720(b)(3) ("[A]n action may be brought for the relief ... in the right of the corporation, by ... one or more of the members thereof.").

*b. Defamation*

**\*26** After analyzing the elements of a claim for defamation, as set out in Section I.B.(1)(e) above, the Court finds that Defendant is not likely to succeed on his defamation claim. Defendant has not alleged that Plaintiff has made any false statement *about him.* As discussed above, an aggrieved party must prove the existence of a false and defamatory statement *concerning the aggrieved party* to create liability for defamation. *See* Restatement (Second) of Torts § 558, 564 cmt. a (1977). Although Harlow admitted using the *enbukstel@freedocmcalls.org* account to send tax returns to a donor on November 11, 2005, there is no indication that the e-mail contained a false statement *about Defendant.* Even if true, Defendant's allegations about the falsity of the tax returns, without a statement regarding Defendant, are insufficient to support a defamation claim based on Harlow's use of Defendant's former e-mail account.

Defendant has also failed to show that the message sent by Harlow on November 9, 2005, from the *ebukstel@freedomcalls.org* account contained false statements about him. The e-mail stated that "the board of directors of the foundation took action ... to terminate [Defendant's] employment" and that "[Defendant] no longer has authority to act on the [Plaintiff's] behalf." (Def.'s Resp. Mem. Def.'s PI Mot. at 6.) Defendant does not challenge the fact that he was, in fact, terminated. He does, however, challenge the effective date of his termination by stating that it is the date on which he received notice (November 10, 2005), not the date on which the board actually decided to terminate him (November 8, 2005). (Def.'s Resp. Mem. Def.'s PI Mot. at 4.) Notwithstanding the date on which Defendant received notice, there is nothing in the record that indicates that Defendant was not in fact terminated at a November

8, 2005 board meeting, thus undermining any allegations of falsity as to this statement. Although the date on which an employee receives official notice of termination is relevant in certain circumstances, such as when a claim for wrongful termination accrues, *see, e.g., Delaware State Coll. v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), this date has no significance in determining the viability of a defamation claim.

In light of the absence of a showing that Plaintiff used the account for defamatory purposes, the Court also finds that Defendant has no legitimate challenge to Plaintiff's ongoing monitoring of the *ebukstel@freedomcalls.org* e-mail. Through the enactment of the Electronic Communications Protection Act (the "ECPA"), Congress "update[d] and clarif[ied] Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." Sen. Rep. No. 99–541, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3555. The ECPA is divided into Title I, which governs unauthorized interception of electronic communications, 18 U.S.C. §§ 2510–2522, and Title II, which governs unauthorized access to stored communications, 18 U.S.C. §§ 2701–2711. Defendant's challenge to continued monitoring of his former business e-mail account, although not expressly alleged, potentially implicates both Title I and Title II.

**\*27** Title I of the ECPA creates liability for the interception of communications. 18 U.S.C. § 2511(1) (emphasis added). ECPA defines the term "intercept" as "the aural or other acquisition of the contents of any electronic ... communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (emphasis added). As in the case of electronic storage, the ECPA creates an exception for business that allows an

> "officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the

rights or property of the provider of that service."

18 U.S.C. § 2511(2).

Title II of the ECPA also creates civil liability for unlawful access to stored communications. 18 U.S.C. § 2701(a). However, Title II excepts from its broad reaching provisions seizures of e-mail authorized "by the person or entity providing a wire or electronic communications service." 18 U.S.C. § 2701(c)(1).

In this case, Plaintiff meets both of the employer exceptions provided in the electronic storage and interception provisions of the ECPA. To the extent that prior e-mails sent to Defendant's *ebukstel@freedomcalls.org* e-mail account are stored on Plaintiff's computer system, Plaintiff has the right to search these stored e-mails as the need arises because Plaintiff provided Defendant with the ability to send and receive electronic communications. *See Fraser v. Nationwide Mut. Ins. Co.,* 352 F.3d 107 (3d Cir.2003) (holding that because the employee's e-mail was stored on the employer's system, the search of e-mails falls within the 18 U.S.C. § 2701(c) exception); *Bohach v. Reno,* 932 F.Supp. 1232 (D.Nev.1996) (holding that police department was allowed to retrieve electronic communications because it was the provider). Further, Plaintiff has the right to "intercept," that is, receive and review future e-mails sent to the *ebukstel@freedomcalls.org* account, so long as it does so in the normal course of business, because Plaintiff is an employer and monitoring is necessary to ensure that current and prospective Supporter and Client email messages are answered in a timely fashion.

Based on the foregoing, the Court finds that Defendant is not likely to succeed on his claim for defamation and there are insufficient questions going to the merits to make this claim a fair ground for litigation.

### c. Filing of Fraudulent Tax Returns

Defendant also alleges that Harlow and Green are liable for filing fraudulent tax returns on behalf of Plaintiff, in violation of 26 U.S.C. § 7206(1). Section 7206(1) of Title 26 provides in relevant part:

Any person who [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony.

**\*28** 26 U.S.C. § 7206(1).

The Court finds that Defendant has no standing to bring this claim. Generally, a private citizen has no authority to initiate a federal criminal prosecution. See *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Furthermore, criminal statutes do not create private rights of action, unless Congress so provides. *Cok v. Cosentino,* 876 F.2d 1, 2 (1st Cir.1989). At present, there is no private right of action available to Defendant under 26 U.S.C. § 7206. *Johnson v. Cullen,* 925 F.Supp. 244, 251 (D.Del.1996). Therefore, Defendant is not likely to succeed on this claim and there are insufficient questions going to the merits to make this claim a fair ground for litigation.

### 2. Irreparable Harm

The Court finds that Defendant has not shown that he will suffer irreparable harm if a TRO or a preliminary injunction does not issue. As previously discussed, Defendant does not have standing to bring the embezzlement, misappropriation, and breach of fiduciary duty claims. Moreover, the defamation claims are meritless because, with respect to the November 11, 2005 email, any false statements made were not made regarding Defendant and, with respect to the November 9, 2005 e-mail, Defendant has not shown that the proffered statements were in fact false. Finally, Defendant has failed to show that he has standing to bring a claim for fraudulent tax documentation under 26 U.S.C. § 7206(1).

Based on the foregoing, Defendant's motion for a TRO and preliminary injunction is hereby denied.

### III. *DEFENDANT'S MOTION FOR APPOINTMENT OF A TEMPORARY RECEIVER*

Case 5:25-cv-01779-ECC-MJK    Document 7    Filed 02/17/26    Page 36 of 40
Freedom Calls Foundation v. Bukstel, Not Reported in F.Supp.2d (2006)
2006 WL 845509

In addition to a TRO and preliminary injunction, Defendant also moves this court to appoint a temporary receiver for Plaintiff. Defendant bases this request on his desire to "clear his name from defamatory distribution of fraudulent tax return documents to donors in a public charity." (Def.'s Mot. Prelim. Injunc. at 18.) Defendant also contends that a receiver is needed to "ensure that corporate assets are not squandered and there will be monies available to attempt to affect remediation if at all possible." (*Id.*)

A district court may appoint a receiver to manage a defendant's assets during litigation. *Rosen v. Siegel,* 106 F.3d 28, 33 (2d Cir.1997) (citations omitted). The appointment of a receiver is considered to be an extraordinary remedy, and should be employed cautiously and granted only when clearly necessary to protect the movant's interests in the property. *Id.* (citations omitted)

Because Defendant has not demonstrated that he has standing to bring any of his claims, Defendant has no cognizable interest in Plaintiff's assets that justifies appointment of a receiver in this action. Defendant's desire to "clear his name" and to protect corporate assets from "squandering" when he is no longer affiliated with Plaintiff cannot serve as a basis for Defendant's requested relief.

## IV. *MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT*

**\*29** Plaintiff has also filed a motion for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Plaintiff has not filed any amendments prior to this request. It is well settled that "leave to file an amended complaint shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), and "should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001).

The Court hereby finds that Plaintiff's request to amend its complaint is not made in bad faith and that Defendant will suffer no prejudice as a result of the amendment, as Defendant has been on notice of the proposed amended complaint since December 8, 2005. Since that date, Defendant has filed numerous pleadings that address the allegations contained in the amended complaint and has also appeared at an evidentiary hearing regarding the allegations contained therein. Therefore, Plaintiff's request to file an amended complaint is hereby granted.

## CONCLUSION

For the reasons stated herein, Plaintiff's motion for a preliminary injunction on the grounds of unfair competition under the Lanham Act, cyber-squatting under the Lanham Act, dilution, and misappropriation of trade secrets is hereby GRANTED. Plaintiff's motion for a preliminary injunction on the grounds of defamation and tortious interference with existing contractual and prospective business relations is hereby DENIED. Defendant's motion for a TRO and preliminary injunction is hereby DENIED. Defendant's motion for appointment of a temporary receiver is hereby DENIED. Plaintiff's motion for leave to file an amended complaint is hereby GRANTED.

IT IS FURTHER ORDERED that a preliminary injunction shall issue, as follows:

A. Bukstel, directly or indirectly, during the pendency of this case and until such time as permanent injunctive relief is entered, if at all, is enjoined from: (1) distributing, marketing, selling, advertising, using or rendering services bearing the Marks, or any colorable imitation thereof; (2) using the Marks, or any colorable imitation thereof, alone or in combination with other words or designs, in connection with any product or service; (3) infringing Plaintiff's proprietary rights in the Marks, including but not limited to its rights at common law with respect thereto; (4) unfairly competing with Plaintiff in any manner whatsoever; (5) diluting the distinctiveness of Plaintiff's proprietary rights in the Marks; (6) continuing to operate any website(s) or to use any e-mail or instant message account that include as part of the domain or other identifying name "freedomcalls" or any colorable imitation thereof; (7) destroying, altering, hiding, transferring or advising or in any way participating (actively or passively) in the destruction, alteration, hiding or transfer of any and all documents, agreements, website development documents, books of accounts, journals, check registers, bank account statements, computer programs, e-mail computer diskettes, discs or software (and/or the information contained thereon), together with and including all other records of any kind or character whatsoever that reflect the operations of Defendant in which the Marks are or have been reflected; and (8) using, retaining, copying, distributing, or causing to be used, retained, copied, or distributed all or any part of the Supporter & Client List, or any other trade secret of Plaintiff.

2006 WL 845509

**\*30**  B. Defendant is directed to file with the Court and serve Plaintiff within fifteen (15) business days after the date of entry of this Order, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 845509

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (10)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Answer and Affirmative Defenses to Counterclaims and Third-Party Claims by Freedom Calls Foundation, Harlow and Green** <br> FREEDOM CALLS FOUNDATION, a New York corporation, Plaintiff, v. Edward BUKSTEL, an individual, Defendant; Edward Bukstel, Counterplaintiff/Third-Party Plaintiff, v. Freedom Calls Foundation, Counterdefendant, and John Harlow III, Kate Green, Warren Sherman, Daniel Kurtz and J.J. Leitner, Third-Party Defendants. <br> 2006 WL 368678 | PDF | E.D.N.Y. | Jan. 13, 2006 | Pleading |
| **2. Complaint** <br> FREEDOM CALLS FOUNDATION, a New York corporation, Plaintiff, v. Edward BUKSTEL, an individual, Defendant. <br> 2005 WL 3777788 | PDF | E.D.N.Y. | Nov. 18, 2005 | Pleading |
| **3. Defendant Bukstel's Motion for Summary Judgment for Illegal Removal from the Board of Directors** <br> FREEDOM CALLS FOUNDATION, Plaintiff, v. Edward BUKSTEL, Defendant, v. Counterclaim, Defendants. <br> 2006 WL 1339347 | PDF | E.D.N.Y. | Mar. 30, 2006 | Motion |
| **4. Motion to Reconsider** <br> FREEDOM CALLS FOUNDATION, Plaintiff, v. Edward BUKSTEL, Defendant. <br> 2006 WL 1020145 | PDF | E.D.N.Y. | Mar. 15, 2006 | Motion |
| **5. Memorandum of Law in Support of Third-Party Defendants, Daniel Kurtz's, J.J. Leitner's and Warren Sherman's, Motion to Dismiss** <br> FREEDOM CALLS FOUNDATION, a New York corporation, Plaintiff, v. Edward BUKSTEL, an individual, Defendant; Edward Bukstel, Counterplaintiff/Third-Party Plaintiff, v. Freedom Calls Foundation, Counterdefendant, John Harlow II, Kate Green, Warren Sherman, Daniel Kurtz and J.J. Leitner, Third-Party Defendants. <br> 2006 WL 374375 | PDF | E.D.N.Y. | Jan. 13, 2006 | Motion |
| **6. Defendant Bukstel's Response Memorandum to Freedom Calls Motion in Opposition to Bukstel's Motion for Temporary Restraining Order and Appointment of a Receiver** <br> FREEDOM CALLS FOUNDATION, Plaintiff, v. Edward BUKSTEL, Defendant, v. Counterclaim Defendants. <br> 2006 WL 374373 | PDF | E.D.N.Y. | Jan. 12, 2006 | Motion |
| **7. Defendant Bukstel's Response Memorandum in Support of Bukstel's Motion to Dismiss Freedom Calls Foundation Order Show Cause Motion** <br> FREEDOM CALLS FOUNDATION, Plaintiff, v. Edward BUKSTEL, Defendant, v. Counterclaim Defendants. <br> 2006 WL 374374 | PDF | E.D.N.Y. | Jan. 12, 2006 | Motion |

**WESTLAW**　© 2026 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **8. Memorandum of Law in Opposition to Defendant Edward Bukstel's Motion for a Temporary Restraining Order, Preliminary Injunction and Appointment of Temporary Receiver** <br> FREEDOM CALLS FOUNDATION, a New York corporation, Plaintiff, v. EDWARD BUKSTEL, an individual, Defendant; Edward Bukstel, Counterplaintiff/ Third-Party Plaintiff, v. Freedom Calls Foundation, Counterdefendant, John B. Harlow II, Kate Green, Warren Sherman, Daniel Kurtz and J.J. Leitner, Third-Party Defendants. <br> 2006 WL 374370 | PDF | E.D.N.Y. | Jan. 05, 2006 | Motion |
| **9. Motion for Temporary Restraining Order, Appointment of Receiver, and Preliminary Injuction for Breach of Fiduciary Responsibility and Violation of New York Non-Profit Law and the By Laws of the Corporation** <br> FREEDOM CALLS FOUNDATION, Plaintiff, v. Edward BUKSTEL (Pro Se), Defendant, v. John Harlow III, Kate Green Freedom Calls Foundation Warren Sherman, Counter Claim Defendants. <br> 2006 WL 374371 | PDF | E.D.N.Y. | Jan. 04, 2006 | Motion |
| **10. Motion for Temporary Restraining Order, Appointment of Receiver, and Preliminary Injuction for Breach of Fiduciary Responsibility and Violation of New York Non-Profit Law and the By Laws of the Corporation** <br> FREEDOM CALLS FOUNDATION, Plaintiff, Edward Bukstel (Pro Se), Defendant, v. John HARLOW III, Kate Green Freedom Calls Foundation Warren Sherman Dan Kurtz JJ Leitner Counter Claim Defendants. <br> 2006 WL 374372 | PDF | E.D.N.Y. | Jan. 04, 2006 | Motion |

**History (3)**

**Direct History (2)**

🚩 ⚠️  1.  Freedom Calls Foundation v. Bukstel
2006 WL 845509 , E.D.N.Y. , Mar. 03, 2006

*Reconsideration Denied by*

2.  Freedom Calls Foundation v. Bukstel
2006 WL 2620648 , E.D.N.Y. , Sep. 12, 2006

**Related References (1)**

3.  Freedom Calls Foundation v. Bukstel
2006 WL 2792762 , E.D.N.Y. , Sep. 07, 2006